**In re SNIDER FARMS, INC., Debtor(s).**

**Bankruptcy No. 87–60512.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Jan. 5, 1988.

Gordon E. Gouveia, Merrillville, Ind., for debtor.

David Thuma, Indianapolis, Ind., for Equitable Life Ins.

Richard Browne, Valparaiso, Ind. for Northern Ind. Bank and Trust.

## MEMORANDUM OPINION AND ORDER [1]

KENT LINDQUIST, Chief Judge.

### I

### *Statement of Proceedings*

This case came on for hearing on December 16, 1987, on Application by Chapter 12 Debtor for Confirmation of First Amended Plan filed October 27, 1987, and Objection thereto filed by the Equitable Life Assurance Society of the United States (hereinafter: "Equitable") filed on December 16, 1987.

The Court by order of October 19, 1987, 79 B.R. 801, had denied confirmation of the Debtor's original plan filed June 24, 1987. This plan had been objected to by Equitable on July 28, 1987, and by Northern Indiana Bank and Trust Company (hereinafter: "NIB") pursuant to objections filed July 28, 1987. The trustee's report recommending that the Debtor's original plan should not be confirmed was filed August 3, 1987.

Although the October 19, 1987 order sustained the objection of Equitable, NIB and the trustee orally stipulated with Debtor at the hearing as to the resolution of their objections, and thus the following issues were resolved as to the Debtor's plan, and as the terms of those stipulations were incorporated into the Debtor's amended plan, are thus no longer in issue. Those portions of the plan as amended so resolved are as follows:

1. The Debtor will comply with § 1225(a)(4) by paying to the trustee for and on behalf of unsecured creditors the sum of $20,000 at 6% interest over 3 years or $7,482.20 per year (Clause 3.6; Class VI: unsecured creditors).

2. The Debtor shall pay NIB the sum of $36,400. at the rate of 9% per annum over 30 years with an annual payment of $3,543.00 as the present value of its allowed secured claim as to certain real estate owned by the Debtor in which NIB has a mortgage lien. (Clause 3.4; Class IV).

3. The Debtor shall pay NIB the sum of $82,300.00 at the rate of 9% per annum over 7 years with an annual payment of $16,353.00 as the present value of its allowed secured claim as to certain equipment and inventory owned by the Debtor in which NIB has a security interest.

Equitable is a Class II creditor, and Clause 3.3 of the Debtor's amended plan provides for Equitable as follows:

3.3 *Class III: Equitable Life Assurance Society of the United States (Equitable)*. The Debtor shall pay the secured claim of Equitable in the amount of $521,265.00 as follows:

a. Commencing on January 15, 1988, the Debtor shall pay the principal amount as above stated in annual payments for a period of 30 years at an interest rate of 8.98% per annum, and on the same date annually thereafter. Equitable shall maintain its lien to secure payments hereunder.

---

[1] This Order constitutes the Courts Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52 as made applicable by Bankruptcy Rules 9014 and 7052.

b. The Debtor shall have the right to prepay all or any part of the principal indebtedness at any time.

c. In the event the Debtor shall sell any portions of said property, the net proceeds from said sale shall be paid to Equitable, one-half of which shall be applied as partial payment of the next annual principal payment, excluding interest. If said proceeds are in excess of said annual payment, then it shall be applied against succeeding annual principal payments until credited in full. The remaining one-half of said proceeds shall be applied to the principal amount of the indebtedness.

The Debtor's plan providing that the value of Equitable's allowed secured claim is $521,265.00 is the value found by the Court in its order of October 19, 1987, denying the confirmation of the Debtor's first plan. The Debtor's original plan valued said property at $424,000.00, while Equitable submitted evidence at the hearing in support of its objection to the initial plan that the value thereof was $593,175.00. Inasmuch, as the Court found that the value of the property in question was $521,265.00, the Court denied confirmation of the plan without taking further evidence on the remaining objections by Equitable or whether the Debtor had met his burden of proving that the plan had met all of the other requirements of § 1225.

The objection to the Debtor's first amended plan filed by Equitable on December 14, 1987 contained 7 separate objections (rhetorical paragraphs 4 through 11), including, among other things, that the plan was not feasible.

The Debtor objected to Equitable submitting any evidence in support of its objection in that the Court's order of November 17, 1987, setting the Debtor's first amended plan for confirmation hearing contained a bar date for objections of December 11, 1987. It is thus clear that the objection was not timely filed.

Bankruptcy Rule 9006(b)(1) grants the Court authority, for cause shown, in its discretion, to enlarge the time to perform an act required to be done at or within a specified time required by the Bankruptcy Rules or by order of the Court on motion made after the expiration of the specified period, where the failure to act was the result of excusable neglect.

Equitable made its oral motion at the hearing to allow entertainment of its late filed objection based on excusable neglect.

Attorney Thuma, counsel for Equitable, testified that through a clerical error, the exact reason being unknown, his secretary failed to cause the objection to be timely filed, that the objection has been drawn well in advance of the bar date, and that Debtor's counsel was aware of the proposed objection pursuant to previous discussions with Debtor's counsel, and at a status conference held by the Court on the Debtor's amended plan on December 1, 1987.

Attorney Gouveia, counsel for the Debtor, testified he was not aware of the objections that were to be registered by Equitable except the one going to feasibility that was discussed at the status conference.

The Court in *In re Snyder*, 74 B.R. 872 (Bankr.E.D.Pa.1987) addressed the issue of "excusable neglect" where there was a late-filed objection by a creditor to the proposed sale of certain property by the Debtor. The prospective purchaser argued that the creditor had no standing to oppose the motion as the objection was not timely. The Court stated as follows:

Although not statutorily defined, most courts have interpreted "excusable neglect" to mean: ... The failure to timely perform a duty due to circumstances which were beyond the reasonable control of the person whose duty it was to perform.

*In re Manning*, 4 B.C.D. 304, 305 (Bankr.D.Conn.1978); *accord, e.g., In re O.P.M. Leasing Services, Inc.* 48 B.R. 824, 830 (S.D.N.Y.1985); *In re Stern*, 70 B.R. 472, 475 (Bankr.E.D.Pa.1987); *In re Figueroa*, 33 B.R. 298, 301 (Bankr.S.D.N.Y.1983); *In re Klayer*, 13 B.R. 542 (Bankr.W.D.Ky.1981). Among the factors to be considered in determining whether conduct meets this standard are

the adequacy of the notice provided, the reason for the delay, and the prejudice, if any, caused by the delay. *In re O.P.M. Leasing Service, Inc; In re Figueroa.*

Here, applying the provisions of Bankr.Rule 9006(e) and (f), Meridian's objection was but a few days late and the lateness was caused, according to Meridian, by a defect in the notice—that is, the notice's failure to be dated—which was not caused by Meridian. Moreover, the hearing on the trustee's motion did not take place until five months after the objection was filed. There was no showing of any harm or prejudice to the purchaser by the delay of a few days. *Compare In re Northern Star Industries, Inc,* 38 B.R. 1019 (Bankr.E.D.N.Y.1984) (after no objections were filed, the purchaser made improvements to the property exceeding $15,000.00). Therefore, I conclude that Meridian has demonstrated excusable neglect for its late filing. *See In re Trails's End Lodge, Inc.,* 54 B.R. 898, 902 (Bankr.D.Vt.1985) (rejection of plan and objection to confirmation filed three days late would be considered as there was no prejudice to the debtor); *In re Klayer,* 13 B.R. at 542 (excusable neglect shown when notice was defective, objector's filing was two days late, and the debtor was not prejudiced). *Cf. In re Table Talk, Inc.,* 53 B.R. 937, 941–942 (Bankr.D.Mass.1985) (excusable neglect would be shown if late filing objector gave notice of objection before hearing and attended hearing).

*Id.* at 875–76.

■ The Court finds that the unexplained clerical error in not getting the objection timely filed was not shown to be based on excusable neglect as to all issues except as to feasibility (11 U.S.C. § 1225(a)(6)). There was no showing, other than an unspecified intra-office snafu had occurred, that the failure to timely file the objection was beyond the reasonable control of Equitable. Neither, the contents of the notice itself nor the service thereof upon Equitable was defective. However, Equitable had advised Attorney Gouveia's associate at the status conference held on December 1, 1987, and prior to the bar date

for objections, that it would raise that issue. Thus, even though the objection was untimely, the Debtor was not prejudiced as to the objection on feasibility as it was clearly prepared to submit extensive evidence on the issue. The Court thus permitted Equitable to cross-examine the Debtor in its main case, and present its own evidence in support of its objection as to feasibility and no other issue. The Debtor would be prejudiced as to the submission on any of the other enumerated objections as no prehearing or status conference was held after the objection was filed, and the final evidentiary hearing was held only two days after said objection.

Rhetorical paragraph 7 of Equitable's objection filed December 14, 1987, states that "Equitable objects to the amended plan because it is not feasible."

David E. Snider (hereinafter: "Snider") president of the Debtor, testified that the Debtor had completed its farm operations for 1987. He summarized the present status of his crops as follows:

1. Soybeans: The total acreage for soybeans was 532 (492 owned and 40 leased), while the yield per acre was 37 or 19,684 bushels. The sale price was $5.15 an acre. 70% had been sold. 4000 bushels were still in storage, and should sell for $5.50 to $5.75 net to the Debtor per bushel and should generate an additional $22,000.00 in gross income. (The summary of operations filed by Debtor September 10, 1987, projected a price of $4.90 a bushel and 40 bushels per acre).

2. Corn: All corn is sealed and in storage on the Debtor's farm in excellent shape and eligible for a CCC crop loan. CCC has measured the crop. The yield for 243.5 acres is 127 to 128 bushels per acre or an estimated 30,752 bushels of corn. The CCC loan rate will be $1.91 per bushel net to the Debtor. The Debtor estimated gross income (loan value) is $60,000.00 (243.5 acres × 127 bu. per acre × 1.91 per bushel equals $59,065.00).

Snider testified that all expenses for the above crops have been paid in full.

In addition to the gross income from the bean and corn crops, Snider estimated that the Debtor still had $10,000.00 to $15,000.00 due from the U.S. Government "set aside" program, while $10,000.00 to $12,000.00 had been received by the Debtor since its amended summary of operations filed September 10, 1987.

Snider noted that his projections of gross income for 1987 in the Debtor's summary of operations was $110,000.00 and that his actual income should be right at that figure.

According to Snider, the Debtor had obtained an $80,000.00 operating loan from NIB for the 1987 crop input expenses of which approximately $65,000.00 had been repaid out of the previous sale of 70% of the soybeans, which amounted to $70,000.00 thus, leaving a principal balance of $15,000.00 plus some interest owing to NIB,, the exact balance or interest expense not being known to Snider. Also, an unspecified amount of the proceeds from the previous sale of the soybeans was used to pay off input expenses for the 1987 crops such as fertilizer bills, fuel bills, as well as, real estate taxes and insurance, though Snider was not clear on the amounts.

Snider stated that his average operating loan for a year is around $80,000.00 and the interest rate thereon has been around 11% per annum, but the loan is not for the whole year and all loan proceeds on the line of credit are not drawn down at one time, and thus, the interest expense is not a full $8,800.00. Although, Snider did not know the actual interest expense for the year 1987, and none was reflected in the Debtor's summary of operations, he stated the loan was only drawn down on during the period of March through August and thus the interest was not a major expense.

The Debtor also called Edward T. Campbell, who testified as an expert witness as to the value of the Debtor's real estate subject to Equitable's mortgage. He testified that the value of the land had not changed since the previous confirmation hearing on the Debtor's land held in August and September of 1987, and as reflected in the Court's order of October 19, 1987, wherein the Court found the value of the real estate subject to Equitable's mortgage to be $521,265.00.

The Debtor did not introduce any evidence on whether the interest rate of 8.98% per annum proposed in the Debtor's plan was an appropriate interest rate to pay Equitable in order that it receive present value on its allowed secured claim.

Based on the Court's ruling on the late filed objection to confirmation by Equitable the Court denied Equitable's request to call one Wayne Back who intended to testify as to the appropriate discount factor and interest rate to be applied in determining the present value of its allowed secured claim, but permitted Equitable to call Dr. Robert Sutter, Ph.D. (hereinafter: "Sutter"), as an expert witness to testify solely on the feasibility of the Debtor's plan.

Sutter testified that he had reviewed the Debtor's summary of operations, its tax returns, and the Debtor's Porter County ASCS reports as to the Debtor's acreage bases, and yields (Respondent's Exhibit "1"), and that in his opinion he was doubtful that the Debtor's plan was feasible.

Sutter noted that the average yield for corn in Porter County for the last 10 years was 105.6 bushels per acres, and the ASCS records of the Debtor show an average yield by the Debtor over the last five years of 113 bushels per acre (a five year moving acreage is used whereby the highest and lowest years are disregarded).

As to beans, Sutter stated that the average relationship between corn and beans is beans are 32% of corn while the Debtor's figure showed 34%. Therefore, the Debtor's production of 37 bushels per acre was a good average for beans.

Sutter had prepared projections based on $1.80 a bushel for corn and $4.90 for beans based on the Debtor's April, 1987, summary of operations, while accurate then, he admitted was too low now.

Sutter prepared a written "Economic Analysis of Chapter 12 Reorganization Plan" ("Analysis") (Respondent's Exhibit

No. 2), which among other things contained certain data on the value of the real estate in question and on feasibility, to support his opinion, which Equitable tendered into evidence. The Debtor objected thereto, on the grounds that certain data and information therein was not admissible, and that Sutter did not testify as to certain data and information contained therein. The Court reserved its ruling on said objection, and because the summary was not available for inspection by the Debtor prior to the hearing, the Court also granted the Debtor the opportunity have the hearing adjourned for a reasonable period of time, until it had an opportunity to examine the analysis in detail, so that the Debtor could be fully prepared to cross-examine Sutter and to object to his opinion based on the analysis on the grounds that the opinion was mere conjecture or speculation and not based upon the type of facts or data reasonably relied upon by experts in the field. The Debtor declined and the hearing proceeded. The Court advised the party it would examine the analysis after the hearing, and make a determination as to what extent the data and information contained therein was admissible, but in any event only that data and information contained therein relating only to feasibility that was otherwise admissible would be considered to be in evidence.

Federal Rule of Evidence 1006 regarding summaries states as follows:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both by other parties at reasonable time and place. The court may order that they be produced in court.

The use of summaries by witnesses such as accountants and appraisers is frequently permitted in Bankruptcy Courts as well as other courts to aid the trier of fact in understanding the evidence. *See, e.g., Matter of Nance,* 4 B.R. 50 (Bankr.W.D.Mo. 1980) (accountant's summary to establish debtor's average monthly income); *Matter of Beverage Transport, Inc.,* 2 B.R. 367 (Bankr.W.D.N.Y.1980) (accounting ledger properly used as summary of invoices).

If the summaries are used in opening statement or closing argument to comment on the evidence, they are not in evidence but merely part of the argument; *See, e.g., United States v. Evans,* 572 F.2d 455 (5th Cir.1978), *reh'g. Den.* 576 F.2d 931 (5th Cir.1978).

In order to admit a summary, the proponent must lay a proper foundation that the summarized material is itself admissable and the summary is accurate. *Needham v. White Laboratories, Inc.,* 639 F.2d 394, 403 (7th Cir.1981), *cert. den.* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 237 (1981).

The summary must be one of the contents of the documents and not a summary of the testimony. *In re Rath Packing Co.,* 36 B.R. 979 (Bankr.N.D.Iowa 1984).

A trial court sitting without a jury is entitled to great latitude regarding the admission or exclusion of summary evidence, *Wright v. Southwest Bank,* 554 F.2d 661 (5th Cir.1977).

Federal Rule of Evidence 1006 may be considered in conjunction with Fed.R.Evid. 703 regarding the bases of opinion by experts. Fed.R.Evid. 703 provides as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Whether the facts, data or opinions are of a type reasonably relied upon is a preliminary question for the Court pursuant to Fed.R.Evid. 104(a). *United States v. Lawson,* 653 F.2d 299 (7th Cir.1981), *cert. den.,* 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982).

Also, Fed.R.Evid. 705 provides that an expert may testify in terms of opinion or inference and give reasons therefore with-

out prior disclosure of the underlying facts or data unless the Court requires otherwise and the expert may in any event be required to disclose the underlying facts or data or cross-examination.

It has been held that while projections of future lost profits are not legitimately admissible as summaries under Fed.R.Evid. 1006 since they are interpretations of past data and projections of future events, not simply a compilation of voluminous records they nevertheless may be admissible as opinion evidence under Fed.R.Evid. 701 and 702. *See Teen–Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399, 462–64 (3d Cir.1980). *See also, State Office Systems v. Olivetti Corp. of America*, 762 F.2d 843, 845–46 (10th Cir.1985), where an exhibit purported to be a summary of both actual damages and loss of future profits. It was held that the summary was admissible as a business record under Fed.R.Evid. 1006 and 803(b) as to actual damages, and admissible under Fed.R.Evid. 1006 as opinion testimony under Fed.R.Evid. 701 and 702 as to loss of future profits.

The relevant portion of the analysis by Sutter begins at page three and discusses cash flow and income and expenses projections which of course, goes to the issue of the feasibility of the Debtor's plan, a requisite to confirmation pursuant to § 1225(a)(6). The Court will not consider that portion of Sutter's analysis of the pages one through page three that relates to the value of the real estate based upon its ruling as to what evidence Equitable may submit in support of its late-filed objection discussed above.

The evidentiary issue thus boils down to what extent the analysis, which is a summary of Sutter's examination of the Debtor's summary of operations, and a summary of data collected by Sutter from third parties together with his application thereof to the Debtor's plan can be used by Sutter as a base for his opinion as to projected income and expenses of the Debtor and thus feasibility.

It has been held, pursuant to Fed.R.Evid. 703, that expert opinions based upon facts or data upon which experts may reasonably rely, such as governmentally approved tables or codes, are acceptable bases for expert opinions. *Frazier v. Continental Oil Co.*, 568 F.2d 378 (5th Cir.1978); *See, e.g., Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223 (5th Cir.1977) (expert used U.S. Dept. of Labor statistics). *Baumholser v. Amax Coal Co.*, 630 F.2d 550 (7th Cir.1980) (Statistical studies compiled by a questionnaire survey held no independently admissible but type of information reasonably relied upon by other experts in the field). *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir.1980) (Expert management consultant permitted to base opinion on, among other things, "stock analyst people that are analyzing companies for a living".)

It has also been held that it is reasonable for experts to rely on the opinion of experts in other fields as background material for arriving at an opinion. *United States v. 1014.16 Acres of Land*, 558 F.Supp. 1238 (W.D.Mo.1983). *See, e.g., Ramsey v. Culpepper*, 738 F.2d 1092, 1101 (10th Cir.1984) (expert economist and mathematician held to have properly relied on rental-value chart prepared by appraiser who also testified to calculate damages).

■ Reports of field agents are sources on which an expert witness may reasonably rely as a basis for his opinions. *United States v. Genser*, 582 F.2d 292, 49 ALR Fed. 335 (3d Cir.1978), *later app.*, 595 F.2d 146, *later app.* 602 F.2d 69, *cert. den.*, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979).

The Court must determine whether the supporting data is trustworthy. *In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1223 (E.D.N.Y.1985).

■ Sutter testified he relied on his examination of the Debtor's summary of operation filed with the Court pursuant to its general operating order, his personal view of the Debtor's farm operation, the appraisal given by Allan Orr, whose expert opinion was given on behalf of Equitable at the previous confirmation hearing, the ASCS records for Porter County, and the data collected by the Indiana Crop Reporting Service in rendering his opinion on yields, prices, expenses, net income, and thus feasibility.

The Court finds that the data developed in Sutter's analysis is the type reasonably relied upon by experts in his field, is trustworthy, that a proper foundation was laid therefore, and thus, the data and information set out in said summary may properly form the basis for his expert opinion and projections as to the Debtor's future income and expenses and the feasibility of the Debtor's plan.

The analysis shows that the ten-year Porter County average for corn yields was 105.6 bushes per acre, while the ten-year average for soybeans was 33.3 bushels per acre.

Sutter testified that the ASCS records showed the Debtor had an average yield of 113 bushels per acre based on a five year average (Respondent's Exhibit 1). Based on an estimated average of a 32% relationship of corn to beans, and the fact that the Debtor had a 34% relationship, the 37 bushels per acre average for beans obtained by the Debtor seemed a good average to Sutter.

The analysis also showed a ten year average price per bushel for corn to be $2.44 and $6.21 for soybeans. However, the average price for 1986 corn was only $1.50, while the average price for 1986 soybeans was only $4.65.

The Debtor's estimated yields and prices in the Debtor's summary of operations upon which Sutter based his projections for 1987 gross income showed $1.80 a bushel for 241.5 acres at 115 bushels per acre for a total of $49,887.00, and $4.90 a bushel for 567.5 of beans at 37 bushels per acre for a total of $102,888.00. Sutter admits these figures are now on the low side.

The Debtor's actual yields and prices which Sutter stated were correct were higher than projected by Sutter; however, Sutter, stated that over the longer term, the Debtor's yields will be lower than as reported for 1986 and 1987 as these were excellent and above average years. Sutter estimated that 115 bushels an acre for corn would be a good average over the next 10 years. The 1987 average yields had not been reported. (The average for 1985 was 104 bushels per acre for corn and 118 acres

for 1986 while the average for soybeans for 1985 was 38 bushels per acre, and 36 bushels per acre for 1986). Sutter noted that with improved technology and the fact higher yields are obtained because crops are planted on the best land under the set aside program, yields will probably be higher in the future but will not average what was obtained in 1986. In addition, for every $1.00 of increased revenue, Sutter estimates a 30 to 35 cent increase in expenses for seed, fertilizer and harvest expenses.

Sutter agreed that the Debtor's expenses were reasonable and proper as far as they went, but does not take into account the required annual payment to unsecured creditors of $7,842.20, trustee's commissions on plan payments, repair and replacement of equipment, legal expenses, lease payments on leased land, interest on the annual operating loan, and an interest rate on Equitable's allowed secured claim that is more in keeping with current market rates.

Sutter related that the average life and depreciable period for machinery and equipment is eight years, while the life of the grain storage building would be twenty years. He also opined that the normal depreciation expense would be $35,198.00 a year, however, that actual capital expenditures are usually lower than depreciation. No evidence was submitted as to the age or condition of the equipment and thus it was difficult to project what these expenses would be in the future.

Snider testified in rebuttal that the ASCS figures of 113 bushels per acre was not a true average for the Debtor's farm but are based on older figures since the actual yields had not been reported to the ASCS by the Debtor for some eight to ten years, and although he did not produce any specific evidence on the point asserted that the Debtor's yields were consistently superior to those used in Sutter's assumptions.

## II

*Conclusions of Law and Discussion*

To obtain confirmation of a Chapter 12 plan the Debtor must meet each and every requirement of 11 U.S.C. § 1225.

It is noted that § 1225(a) is identical to § 1325(a) that was in effect prior to the passage of § 1225. In fact, Chapter 12 is basically modeled after Chapter 13. *See* H.R. 5316, 99th Cong. 2nd Sess. 132, Cong. Rec.H. 8999 (1986). Thus, Chapter 13 case precedents provide a valuable tool for interpretation of chapter 12 because of the identical language. *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125, 126 (Bankr.D. Mont.1987); *In re Beyer,* 72 B.R. 525, 527, n. 1 (Bankr.D.Colo.1987). This is also true as to the interpretation of certain provisions of Chapter 11.

The Court has an independent duty pursuant to § 1325(a) to determine whether a debtor's plan should be confirmed. *In re Jacobs,* 43 B.R. 971 (Bankr.E.D.N.Y.1984). *In re Harris,* 62 B.R. 391, 393, n. 1 (Bankr. E.D.Mich.1986) (interpreting § 1322 and § 1325, the Court denied confirmation though objecting party did not appear at hearing and certain issues were not briefed); *In re Jewell,* 75 B.R. 318, 319 (Bankr.S.D.Ohio 1987) (Chapter 13).

It has also been held regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court an independent and mandatory responsibility of determining whether the requirements of 11 U.S.C. § 1129(a), and if applicable 11 U.S.C. § 1129(b) have been met. *In re Agawam,* 63 B.R. 612, 618 (Bankr.D.Mass.1986); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N. Y.1986); *In re N.S. Garrott & Sons,* 48 B.R. 13, 15 (Bankr.E.D.Ark.1984); *In re Nolen Tool Co.,* 50 B.R. 488 (Bankr.W.D. Ark.1985).

The plan proponent has the burden of proving the satisfaction of each of the requirements to have a plan confirmed. *In re Agawam,* 63 B.R. 612, 619, *supra,* (interpreting § 1129(a)); *In re Goodavage,* 41 B.R. 742 (Bankr.E.D.Va.1984) (interpreting § 1325).

■ Thus, even though the Court has only permitted Equitable to submit evidence on the question of feasibility, the Debtor has the burden on all elements of § 1225 and the Court must make an independent determination that the plan complies with § 1225.

Bankruptcy Rule 9017 provides that the Federal Rules of Evidence apply in cases under the Code.

Federal Rule of Evidence 201 provides that the Court, whether or not requested, may take judicial notice of adjudicative facts at any stage of the proceedings.

It was held in *In re Woodmar Realty,* 294 F.2d 785, 788 (7th Cir.1961), *cert. den.* 369 U.S. 803, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962), that a bankruptcy court is duty bound to take judicial notice of its records and files. *See also, State of Florida Board of Trustees of Internal Improvement Trust Fund v. Charley Toppino & Sons, Inc.,* 514 F.2d 700, 704 (5th Cir.1975) (not error for bankruptcy court to take judicial notice of related proceeding and records in cases before court).

■ Even though the same bankruptcy court may hear many separate proceedings and matters within the same case each proceeding or matter is litigated on its own merits relating to the introduction of evidence under the Federal Rules of Evidence, subject to the rules of *res judicata* (claim preclusion), collateral estoppel, (issue preclusion) and the law of the case.

A distinction must be carefully drawn between taking judicial notice of the *existence* of documents in the Court file as opposed to the truth of the facts asserted in those documents. *See In re Aughenbaugh,* 125 F.2d 887, 889 (3d Cir.1942). The authenticity of a court document does not automatically insure its introduction into evidence in the face of other objections such as hearsay.

■ Thus, while a Court may take judicial notice of the existence of each document in the Court's file it may only take judicial notice of the *truth* of facts asserted in documents such as orders, judgments, and findings of fact and conclusions of law because of the principles of collateral estoppel, *res judicata,* and the law of the case. *See Aloe Creme Laboratories, Inc. v. Francine Co.,* 425 F.2d 1295, 1296 (5th Cir.1970) in upholding the district court's

granting of a motion for summary judgment where the court stated: "The District Court clearly had the right to take notice of its own files and records and it had no duties to grind the same corn a second time. Once was sufficient." *See, e.g., In re Kors, Inc.*, 15 B.R. 444, 446 (Bankr.D.Vt. 1981).

Accordingly, the Court takes judicial notice of its Memorandum Opinion and Order of October 19, 1987, finding that the value of the Debtor's property subject to Equitable's lien is $521,265.00. Inasmuch as the hearing *sub judice* is based on an objection by Equitable to the Debtor's amended plan while the October 19, 1987, order was based on Equitable's objection to the Debtor's original plan it is not clear whether the presently contested matter is a *separate* contested matter from the first plan hearing so that the doctrine of collateral estoppel is applicable. *See, Matter of Busick*, 65 B.R. 630, 633 (N.D.Ind.1986). Nevertheless, even if not applicable, the Court's Order of October 19, 1987 is the law of the case as to value.

The Court having previously found that the value of the Debtor's realty subject to Equitable's lien is $521,265.00 in its order of October 19, 1987, and inasmuch as the only competent evidence on the issue was that of the Debtor's appraiser Campbell, who stated there was no change in the value of the real estate since that time, the Court takes judicial notice of the October 19, 1987 order, and finds that the value of Equitable's allowed secured claim pursuant to § 1225(a)(5)(B)(ii) is $521,265.00.[2]

The Court upon examination of the record and the Debtor's plan finds that Sections 1225(a)(2) and (3) have been complied with.

The Court further finds that the Debtor's plan also meets the requirements of § 1225(a)(4), or the "best interest of creditors test" based upon the stipulation of the parties and the trustee at the previous hearing as to the confirmation of the Debtor's original plan, and that this requirement has been satisfied by the Debtor's amended plan which provides for an annual minimum payment of $7,842.20 per year for three years to unsecured creditors. The Court will next address that portion of the Debtor's plan which proposes to pay Equitable an interest rate of 8.98% per annum on its allowed secured claim.

Section 1225(a)(5)(B)(ii) like § 1325(a)(5)(B)(ii) and § 1129(b)(2)(A)(i)(II), provides that the Debtor must pay to the holder of an allowed secured claim, "the value, *as of the effective date of the plan*, of property to be distributed by the trustee or the Debtor under the plan on account of such claim is not less than the allowed amount of such claim; ..." (Emphasis added).

As stated in *In re Martin*, 66 B.R. 921 (Bankr.D.Mont.1986):

As to secured creditors, the plan may be confirmed under 1129(b)(2)(A)(i) if the secured creditor retains a lien securing the amount of its allowed secured claim and it receives deferred cash payment having a present value, as of the effective date of the plan, equal to the present value of the collateral. *Ahlers*, at 401. (*In re Ahlers*, 794 F.2d 388 (8th Cir. 1986)). Moreover, the allowed secured claim must equal the value of the collateral at the time the plan is confirmed. 11 U.S.C. 506(a). In that regard, "application of the test under [11 U.S.C. 1129(b)(2)(A)] also requires a valuation of the consideration as of the effective date of the plan" and

"[T]his contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and full future value will be identical. Normally, the interest rate used in the

---

2. Equitable has filed its Motion for Leave to Appeal the Court's finding as to value in its October 19, 1987 Order. If this Motion was granted and this Court was reversed on that issue, of course this Order or any subsequent Order would have to be modified accordingly, or additional evidence taken, depending on how the District Court would rule. Pursuant to Bankr.R. 8005, this Court has elected to continue to hear all other issues during the pendency of the Motion for Leave to Appeal.

plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments." H.R.Rep. No. 595 at 414–15, 1978 U.S. Code Cong. & Ad.News at 6370–71; *In re Ahlers, supra,* at 401, ft. 15.

*Id.* at 927.

Present value has been described as follows:

The concept of "present value" is of paramount importance to an understanding of section 1129(b). Simply stated, "present value" is a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence. Part of the "present value" concept may be expressed by a corollary proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate.

The problem with the corollary proposition is that it only says that a dollar has investment value measured by the amount that the market will pay for the use of the dollar. The actual rate of interest on a dollar is determined by the risks which the lender is willing and able to assume.

5 *Collier on Bankruptcy* par. 1129–03(1), p. 1129–62 (L. King 15th ed. 1985).

Present value is not necessarily a legal concept, but rather a term of art used by the economic and financial communities. *In re Fisher,* 29 B.R. 542, 543 (Bankr.D. Kan.1983).

Application of present value payments by use of a discount factor, is not due to any express or implied contractual obligations but is simply the result of the Debtor's deferred payment. *See In re Young,* 61 B.R. 150, 152 (Bankr.S.D.Ind.1986), and cases cited therein.

At this point the Court would like to point out the distinction between the continued accumulation of post-petition interest at the contract rate as to an oversecured creditor pursuant to § 506(b) and the determination of the discount rate under "cramdown" pursuant to § 1129(b)(2)(A)(i)(II), § 1225(a)(5)(B)(ii), and § 1325(a)(5)(B)(ii) on confirmation of a plan.

Normally, the accumulation of interest upon a claim against the Debtor stops when the bankruptcy petition is filed. *Matter of Boston and Main Corp.,* 719 F.2d 493–95 (1st Cir.1983); *In re Petite Auberge Village,* 650 F.2d 192, 194 (9th Cir.1981).

11 U.S.C. § 506(b) is an exception to that general rule, i.e. when a secured creditor is oversecured, interest will continue to accumulate post-petition to the extent there is collateral available to pay the interest. Once the collateral is depleted, the creditor no longer has any property interest and therefore the payment of interest abates. *In re Ladycliff College,* 56 B.R. 765, 765 (S.D.N.Y.1985).

11 U.S.C. § 506(b) provides as follows: (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement of which such claim arose.

It should be noted that § 506(b) treats "interest" and "fees, costs or charges" differently. The interest provision is *not* subject to the reasonableness limitation. Where an oversecured creditor seeks interest on its claim, the bankruptcy court applies the security agreement's rate of interest. *Matter of 268 Ltd.,* 789 F.2d 674, 676 (9th Cir.1986), *citing, In re Rutherford,* 28 B.R. 899, 902 (Bankr.N.D.Ill.1983), and *In re Elmwood Farms, Inc.,* 19 B.R. 338, 341 (Bankr.S.D.N.Y.1982). *See also, Collier on Bankruptcy,* par. 506.05 (p. 506–37–49) (L. King, 15th ed.); *Matter of Johnston,* 44 B.R. 667, 669 (Bankr.W.D.Mo.1984).

The great majority of the courts have held that the proper rate of interest under

§ 506(b) is the rate provided by the contract if there is such a contract; that is, the rate to which the creditor was entitled immediately prior to the petition and to which it would have been entitled to in the absence of the petition. *See e.g., In re Corliss,* 43 B.R. 176, 178 (Bankr.D.Or.1984); *Matter of Maimone,* 41 B.R. 974, 979 (Bankr.D.N.J.1984); *In re Loveridge Machine & Tool Co., Inc.,* 36 B.R. 159, 162–65 (Bankr.D.Utah 1983).

This rule is only applicable as to the rate of interest to accrue on a pre-petition debt between the date of the petition and the effective date of the confirmed plan. For instance, the discount factor to be used for "cramdown" purposes after the effective date of the plan is governed by § 1129(b)(2)(A)(i)(II) as to Chapter 11, § 1225(a)(5)(B)(ii) as to Chapter 12 and § 1325(a)(5)(B)(ii) as to Chapter 13 and their application should not be confused with the application of § 506(b) prior to confirmation. *Matter of Maimone,* 41 B.R. 974, 978, *supra; See also, In re Loveridge Machine & Tool, Inc.,* 36 B.R. 159, 163–64 *supra.*

■ Thus, while the contract rate of interest between the parties is controlling under § 506(b), it is not controlling upon "cramdown" for the purposes of confirming a plan.

The Courts have applied many different criteria in attempting to adjudicate what is the appropriate discount factor, and thus in arriving at an appropriate interest rate to be paid by the Debtor to insure the secured creditor receives the present value of its allowed secured claim as of the effective date of confirmation.

Although the Seventh Circuit has never ruled directly on the issue as it relates specifically to secured creditors it has passed on the issue of the legal meaning of the phrase "value as of the effective date of the plan" in the context of § 1129(a)(9)(C) as it relates to unsecured priority tax claims, the identical phrase as found in § 1129(b)(2)(A)(i)(II) as it relates to secured creditors. The Court in *Matter of Burgess Wholesale Mfg. Opticians, Inc.,*

721 F.2d 1146 (7th Cir.1983) stated as follows:

A court may confirm a reorganization plan, over an objection, only if with respect to an unsecured priority tax claim, "the holder of such claim will receive on account of such claim deferred cash payments ... of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(C).

\* \* \* \* \* \*

Thus in our view, the critical phrase "value, as of the effective date of the plan" means that proposed payments must be adjusted to allow for the changing value of a dollar. The proposed payments, once adjusted, must equal the face value of the claim at the time the plan is confirmed ...

The legislative history of § 1129(a)(9)(C) conclusively supports our interpretation. The House Judiciary Committee's report accompanying the legislation states that the phrase "value, as of the effective date of the plan" as used in § 1129(a)(9) "indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan." H.R.Rep. No. 595, 95th Cong., 2d Sess. 408, U.S. Code Cong. & Admin.News 1978, 5787 (1978). The report continues its explication of the statute:

This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest paid is equivalent to the discount rate used, the present value and face future value will be identical. On the other hand, if no interest is proposed to be paid, the present value will be less than the face future value. *Id.* at 414–415; *accord* 124 Cong.Rec. 32,406, 34,006 (1978) (joint explanatory statement of floor managers).

*Id.* at 1147.

However, the Court declined to fix the discount or interest rate in *Burgess* and remanded the case for determination by the trial court.

The Court in the *Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983) reversed the bankruptcy court which had confirmed the Debtor's plan. The bankruptcy court had applied the then current rate established by the formula set forth in 26 U.S.C. § 6621 on unpaid federal tax liabilities, less a one-percent reduction for the "rehabilitation" aspects of the plan. 28 U.S.C. § 6621 is based upon a six month average of the predominate prime rate quoted by commercial banks to large businesses as determined by governors of the Federal Reserve Systems. The Court stated:

> The Bankruptcy Courts have almost uniformly ruled that the proper method of providing such creditors with the equivalent of the value of their claim as of the effective date of the plan is to charge interest on the claim throughout the payment period.

> \* \* \* \* \* \*

> Although Bankruptcy Courts generally agree that creditors should receive interest on deferred tax payments pursuant to § 1129(a)(9)(C), they have not agreed on the proper method for determining the appropriate interest rate. *See e.g., In re Bay Area Services* [26 B.R. 811 (Bkrtcy.M.D.Fla.1982)], *supra* (current prevailing prime rate plus 10% adjustment for inflation); *In re Hathaway Coffee House,* 9 Bankr.Ct.Dec. (CRR) 1093, 24 B.R. 534 (S.D.Ohio 1982) (in the absence of any contrary argument by debtor, government entitled to rate set in 26 U.S.C. § 6621); *In re Moore* [25 B.R. 131 (Bkrtcy.N.D.Tex.1982)], *supra* (rejecting IRS argument that rate established by 26 U.S.C. § 6621 should be applied because uncontradicted evidence presented by debtor demonstrated that lower rate would fully compensate the government); *In re Tacoma Recycling,* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982) (rate established by 28 U.S.C. § 1961(a) (§ 302(a) of the Federal Court Improvement Act of 1982) for interest on judgments in federal court). *Compare, e.g.,* the following cases in which courts used various methods of determining the proper interest rate necessary to give a creditor the val-

ue of its claim as of the effective date of the plan in Chapter 13 proceedings: *In re Benford,* 14 B.R. 157 (Bkrtcy.W.D.Ky. 1981) (prevailing market rate for consumer loan contracts); *In re Klein,* 10 B.R. 657 (Bkrtcy.E.D.N.Y.1981) (average of legal rate of interest in State of New York and contract rate); *In re Marx,* 11 B.R. 819 (Bkrtcy.S.D.Ohio 1981) (rate applicable to judgments); *In re Crotty,* 11 B.R. 507 (Bkrtcy.N.D.Tex.1981) (rate established by 26 U.S.C. § 6621); *GMAC v. Willis (In re Willis),* 6 B.R. 555, 557 (Bkrtcy.N.D.Ill.1980) ("annual percentage rate not to exceed ½ of 1% more than the auction average of 3–month United States Treasury Bills" for the week the petition for relief was filed); *GMAC v. Hyden (In re Hyden),* 10 B.R. 21 (Bkrtcy.S.D.Ohio 1980) (average of the interest rate in effect in Ohio for Installment Sales Contracts, the interest rate stated in the contract, and an arbitrary "leveling factor" of 6%); *In re Ziegler,* 6 B.R. 3 (Bkrtcy.S.D.Ohio 1980) (rate established by 26 U.S.C. § 6621 even though the creditor was not a governmental entity); *GMAC v. Lum (In re Lum),* 1 B.R. 186 (Bkrtcy.E.D.Tenn.1979) (adopting 10% rate after considering the contract rate of interest, the relevant state statute regulating interest, and "economic concerns").

\* \* \* \* \* \*

The factors relevant to determining an appropriate interest rate are succinctly summarized in 5 *Collier on Bankruptcy* par. 1129.03, at 1129–65 (15th ed. 1982);

> The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

\* \* \* \* \* \*

The interest rate computed under the formula set out in 26 U.S.C. § 6621 does not meet the criteria for two reasons. First, the § 6621 rate does not necessarily correspond with the "prevailing market rate".... Second, applying the § 6621 rate to all deferred payments under § 1129(a)(9)(C) ignores variations between the length of the payout period, the quality of the security, and the risk of default. Thus although the rate currently charged under § 6621 may be relevant to determining the prevailing market rate, we believe the Court erred by looking exclusively to the § 6621 rate when establishing the interest rate in this case.

As noted in *In re Benford, supra,* a Chapter 13 case construing language identical to that found in § 1129(a)(9)(C), "[t]he statute reads 'value as of the effective date of the plan'; it does not read 'value, as of the effective date of the plan, but subject to reduction depending on the debtor's ability to pay'." 14 B.R. at 161. We believe Congress intended that creditors required to accept deferred payments pursuant to § 1129(a)(9)(C) should be placed in as good as position as they would have been had the present value of their claims been paid immediately. Consequently, we hold that the interest rate to be used in computing present value of a claim pursuant to § 1129(a)(9)(C) should be the current market rate without any reduction for the "rehabilitation aspects" of the plan.

*Id.* at pp. 650–54 (Footnotes omitted).

The Court in *U.S. v. Neal Pharmacal,* 789 F.2d 1283 (8th Cir.1986) reversed the District Court and Bankruptcy Court which confirmed a plan by which the government was to receive deferred cash payments over five years with interest based on the rate paid on thirteen week treasury bills. The government objected and contended the interest rate under § 1129(a)(9)(C) should be the rate established by 26 U.S.C. § 6621. The Court reversed and stated:

Moreover, although some courts have suggested that the risk of nonpayment is minimal in the case of a reorganizing debtor because the bankruptcy court may not confirm a reorganization plan without first finding that the plan is feasible, *See, e.g., Fisher,* 29 B.R. at 544–45, the risk of default for a reorganizing debtor may be at least as great as that of a nonreorganizing corporation debtor of comparable size and structure. Courts must therefore consider the risk that the debtor will not be able to complete the reorganization in determining the prevailing market rate on deferred payments of federal tax claims. In short, before concluding that the section 6621 rate will provide the government with the present value of its federal tax claim, the court must first consider the payment period, the quality of the security, if any, and the risk of default in the particular case.

*Id.* at 1288 (Footnote omitted).

In determining the appropriate discount rate the Court in *In re Monnier Brothers,* 755 F.2d 1336 (8th Cir.1985) stated as follows:

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*Id.* at 1339, *quoting,* 5 *Collier on Bankruptcy,* par. 1129.03, p. 1129–65 (L. King. 15th ed. 1985).

This Court's attention is directed to the analysis given by the Court on *In re Loveridge Mach. & Tool Co.,* 36 B.R. 159 (Bankr. D.Utah 1983), which at pages 165–71 discussed the appropriate discount rate to be applied pursuant to § 1129(b). In that case the debtor proposed to pay the secured creditor over six or seven years at the rate determined by 28 U.S.C. § 1961(a), which is the statutory interest allowed on a money judgment in a civil case recovered in a district court. Such interest is calculated at a rate equal to the coupon issue yield equivalent of the average accepted auction price for the last auction of fifty-two week

United States Treasury Bills settled immediately prior to the date of judgment. The *Loveridge* Court stated:

I find, based upon the above analysis, that none of the opinions which have adopted 28 U.S.C. § 1961(a) as a proper source of a discount rate for deferred cash payments is good precedent for making a decision in this case.

Independent of this conclusion, however, is my opinion that to use 28 U.S.C. § 1961(a) as the source of the interest rate for discounting deferred cash payments to Northwest under this plan would be ill advised and erroneous as a matter of law. Although Section 1961(a) is a convenient source for interest rates and is helpful in determining the risk-free rate of interest for one year loans, this case does not involve a risk-free loan. Neither does it involve a one year loan. Government obligations to repay loans evidenced by treasury bills are, according to he prevailing economic wisdom, among the least risky of all investments. It is to be questioned whether the short-term risk-free rate of interest is a rational, much less a "fair and equitable" rate of interest for debtors' promise to pay Northwest's debt under its plan of reorganization. It has been said that "[n]o index for short term loans ... is a sound baseline for arriving at a fixed rate that is to govern a forced loan for a period of years." Blum, *supra* at 442.

\* \* \* \* \* \*

Thus, although 28 U.S.C. § 1961(a) might be a good source for an interest rate in another case, it is not an acceptable source in this case. Moreover, the propriety of using 28 U.S.C. § 1961(a) as the source of the interest rate in this case is questionable in light of current rates of interest on similar loans.

\* \* \* \* \* \*

In *In re Stockdale Corporation,* Bankr. No. 8101288, transcript of oral ruling, Mabey, J. (Bkrtcy.D. Utah June 23, 1982), the court found that the concept of the time value of money under Section 1129(b) with respect to a class of dissenting secured claims could be approached by beginning with the interest rate on risk-free investments due at the time of the completion of payments under the plan. To the applicable risk-free rate of interest, the *Stockdale* approach adds extra interest where necessary to compensate for risks imposed on secured creditor under the plan. Since secured creditors face some unavoidable risks even in the event of a liquidation, the additional interest to be added to the risk-free rate is based only on the additional risks imposed by the plan.

I find the *Stockdale* analysis persuasive for the particular facts of this case. Debtors' plan fails the first part of the *Stockdale* test because although it uses a risk-free rate of interest, that rate is based on one year obligations, not on obligations due at the time of the completion of the payments under this plan. Debtors' plan fails the second part of the *Stockdale* test because it proposes not to compensate Northwest for any of the additional risks imposed by the plan.

*Id.* at 169–70.

This Court agrees with the analysis of the Court in *Loveridge.*

■ In determining the appropriate discount rate the Court will look to the current market rates taking into consideration the length of the forced loan, the quality of the security, and the risk factors inherent in the forced loan which will bear on the likelihood of default.

It would be a much easier job for the Court to take a simplistic and arbitrary approach and rely on one independent third-party index in every case in determining the proper discount rate. However, this would not be a proper determination of present value. Thus, the Court must decide on a case by case basis, dependent on the facts and circumstances of each case, what the proper market rate of interest is as of the effective date of confirmation to determine the appropriate discount rate.

As noted by *Collier:*

Interest rates are generally determined by market forces—supply and de-

mand. A lender extends credit based upon a perception of an acceptable net return (i.e., profit) measured by reference to the lender's cost of lending (i.e., interest to be earned less cost incurred). The borrower decides from whom to borrow based upon a similar analysis of the borrower's cost of borrowing (i.e., cost of funds = interest to be paid + other costs incurred).

In determining the lender's costs, one must presume that a person will not intentionally borrow $1,000 at 8% in order to reloan the money at less than 8%. One also has to presume that a person borrowing money at 8% will reloan the money at a rate sufficient to recover his cost of funds (8%), plus his cost of reloaning the money, plus his assessment of the risk that his borrower will default and fail to pay interest or repay principal.

Thus, the rate of interest charged in a particular market is affected by supply of funds, present demand for funds, amount to be borrowed, duration of borrowing, and credit risk.

5 *Collier on Bankruptcy*, par. 1129.03, p. 1129–63 n. 45 (L. King 15th ed. 1985).

The Court in *In re Welco, Inc.*, 60 B.R. 880 (9th Cir.B.A.P.1986) also addressed the issue of the appropriate discount factor and stated as follows:

The debtor contends that the current coupon yield rate of 52 week treasury bills is the appropriate rate. In this case, the bankruptcy court relied on *In re Mitchell*, 39 B.R. 696 (Bankr.D.Ore.1984) in determining the appropriate interest rate. In *Mitchell*, the court noted that the applicable Chapter 11 and Chapter 13 provisions are virtually identical and recognized that the payout period must be considered in determining the appropriate interest rate. *Id.* at 701, 702. The court also addressed risks of default:

It should be noted that the risks inherent in a chapter 13 case are less than the risks associated with non-bankruptcy cases because the court's approval of a chapter 13 plan presumes the debtor's ability to complete the plan.

In addition, if the plan is successful, the cost of collection is eliminated.

*Id.* at 702. Under § 1325(a)(5)(B) a secured tax claim in a Chapter 13 is treated similarly to a tax claim under § 1129(a)(9)(C) in a Chapter 11.

The *Mitchell* court ruled that the appropriate interest rate is that which the government must pay to borrow funds for the length of the deferred payment period. We disagree with this result.

Treasury bills and notes reflect the return available on short-term low risk debts. We agree that court approval of a plan may diminish the risks involved in a coerced loan. Nevertheless, the coupon yield on treasury bills represents the federal government's cost of acquiring money in the open market. The coupon yield on treasury bills would be inappropriate since the government is not acquiring money, but is in effect loaning money to the debtor over three or four year periods. The I.R.S. rate is reassessed bi-annually. The rate is based on 100% of the average adjusted prime rate charged by commercial lenders.

The appropriate interest rate is the prevailing market rate for that type and quality of loan. Current market conditions determine what the market rate will be. One factor that has an impact on that determination is the prime rate. Prime represents the rate charged by commercial banks to prime commercial loan customers. *Mitchell* at 701. Factors which influence the determination of prime are the general level of money rates, the availability of reserves, general business conditions, size and term of loan, geographic variations, elements of profit and collection costs. Generally, a statutory legal rate of interest would be insufficient to establish a market rate since it would be unresponsive to current market conditions. *See In re Roxbury Residential Inc.*, 35 B.R. 348 (Bkrtcy.D.Conn.1983). However, at times a fixed rate of interest that is periodically adjusted may accurately-reflect market conditions.

The IRS argued that the rate under § 6621 was intended to be a variable

rate, adjusted every six months, and also, is alike binding upon the government when it owes refunds to taxpayers. The rate may be convenient to use but it is not the manner of assessing value in § 1129(a)(9)(C), as of the effective date of the plan, as contemplated by Congress. If Congress wishes to establish the use of 26 U.S.C. § 6621 in 11 U.S.C. § 1129(a)(9)(C) it can say so.

*Id.* at pp. 882–83. *See also, In re Memphis Bank and Trust v. Whitman,* 692 F.2d 427 (6th Cir.1982); *U.S.A. v. Neal Pharmacal Co.,* 789 F.2d 1283 *supra; Matter of Bentley,* 79 B.R. 413 (Bankr.S.D. Iowa 1987); *In re Robinson,* 75 B.R. 606 (Bankr.D.Mont.1987); *In re Edwardson,* 74 B.R. 831, 836 (Bankr.D.N.D.1987); *In re Lenz,* 74 B.R. 413, 417 (Bankr.C.D.Ill.1987); *In re O'Farrell,* 74 B.R. 421, 424 (Bankr.N. D.Fla.1987); *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125 (Bankr.D.Mont. 1987); *In re Hildreth,* 43 B.R. 721 (Bankr. D.Idaho 1984); *In re Nolen,* 50 B.R. 488 (Bankr.W.D.Ark.1985); *In re N.S. Garrott & Sons,* 48 B.R. 13 (Bankr.E.D.Ark.1984); *Matter of Landmark at Plaza Park, Ltd.,* 7 B.R. 653 (Bankr.D.N.J.1980).

■ The Court wishes to emphasize that if a private institutional lender has an unusually high cost of money because of long term obligations itself had incurred to obtain the funds to in turn make loans at a profit or requires an unusually high return on capital (profit) to compensate it for other non-performing loans whereby the interest rates it in turn charges in the open market are not competitive with the current market rates, the debtor should not be penalized by having to pay an exorbitant discount rate to such a secured party that is in excess of the current market rate. *See e.g., In re Gene Dunavant and Son Dairy,* 75 B.R. 328, 329 (M.D.Tenn.1987), where the evidence showed that the Federal Land Bank of Louisville's contract rate was determined by taking the weighted average of all its outstanding interest-bearing liabilities and added thereto its "spread", typically one-quarter to three quarters of a percentage point. The Court noted that the Land Bank's rate thus reflected the historical cost of funds rather than the current cost of funds, and since the Federal Land Bank of Louisville was not selling bonds in the current market, this created a situation where its formula for variable rate loans creates an artificially high contract rate. The District Court affirmed the finding of the Bankruptcy Court that the current market rate was less than the contract rate of the Land Bank and dismissed the Land Bank's appeal. *See also, In re Wolf,* 61 B.R. 1010, 1012 (Bankr.N.D.Iowa 1986), where the Court noted that it did not believe that "creditor specific" interest rates are mandated by the "fair and equitable" concept embodied in § 1129(b)(1) and (2) *contra: In re Hardzog,* 74 B.R. 701 (Bankr.W.D.Okla. 1987), which held that the creditor's cost of funds is appropriate discount rate to use in calculating present value of an allowed secured claim. The inequitable results that may be achieved by using a "creditor specific" standard for determining an appropriate interest rate can easily be seen if the creditor for certain internal reasons charges unusually low interest rates or charges exorbitant interest rates which are clearly not in line with the prevailing market. The possible violation of the "fair and equitable" standard would be an obstacle that would have to be dealt with in most cases, as seldom are the specific secured creditor's interest rates ever exactly the average or the norm in relationship to the market viewed as a whole. Thus, the Court will look at the prevailing market rate giving due consideration to the amortization period, the quality of the security, the risk of default, and whether the creditor is oversecured and has an "equity cushion" or is undersecured in which can the "forced" loan is the same as a loan with a one to one secured loan to collateral ratio or a 100% secured loan.

The Court is in agreement with the analysis made by the Court in *In re Camino Real Landscape Maint. Contractors,* 818 F.2d 1503 (9th Cir.1987) where in discussing the appropriate discount rate to be paid by the Debtor to the Federal Government on its priority tax claim pursuant to 11 U.S.C. § 1129(a)(9)(C) stated as follows:

If the government receives interest at a rate equal to the appropriate discount rate, its aggregate receipts over the payment period will equal the present value of its tax claims. This is what § 1129(a)(9)(C) requires.

All agree the above quotation from *Collier on Bankruptcy* [5 *Collier on Bankruptcy* par. 1129.03[4][t][1], at 1129–65 (15th ed. 1987) states the proper rule. Both of the circuit courts that have considered the meaning of § 1129(a)(9)(C) have relied on it. *United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8th Cir.1986); *In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 651 (11th Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). The Ninth Circuit Bankruptcy Appellate Panel also quoted it. *Welco,* 60 B.R. 882. Indeed, the government relies on it. appellant's Opening Brief at 30.

Unanimity disappears upon application, however. The government, for example, argues that the proper interest rate for deferred taxes is determined by a very specialized market. That market, it insists, must be determined by applying 26 U.S.C. § 6621. The proper rate is that which this section makes generally applicable to deferred federal taxes. *Id.* at 39; Appellant's Reply Brief at 7 n. 3.

We reject the government's suggestion that the interest rate on deferred taxes for purposes of § 1129(a)(9)(C) is fixed as § 6621 provides. The legislative history of § 1129(a)(9)(C) indicates that the rate of interest on deferred taxes should be the rate of interest that the debtor would pay to borrow a similar amount on similar terms in the commercial loan market. *The debtor's characteristics determine the interest rate. The creditor's characteristics are irrelevant.* Hence the fact that a particular debt arises from taxes due to the government does not affect the appropriate interest rate. It continues to be determined by the commercial loan market.

\*　　\*　　\*　　\*　　\*　　\*

The government is correct when it argues that a bankruptcy court may not calculate the § 1129(a)(9)(C) rate on the basis of interest rates paid on treasury obligations. The treasury rate is the government's cost of borrowing, which is relatively quite low because to the lender the government's obligation is a short-term, low risk investment. The obligation of a private borrower is quit different' its creditworthiness is not the same as the federal government's. It cannot borrow money on the favorable terms available to the government.

Thus in *Hadrian* and *Camino Real* the designated rate of interest is incorrect. In both the bankruptcy court relied on the rate of interest on treasury obligations. The court slipped into this position by reasoning that the government could borrow at the treasury rate *to replenish its funds while it waited for the debtor to make payments.* Congress did not provide for such an approach. Under the bankruptcy court's approach, the government would incur an unconditional obligation to repay the money it was required to borrow, and would receive in exchange only an inherently risky promise by the debtor to repay the same amount over the applicable time period at essentially the same rate paid by the government on its obligation. The government would be worse off as a result of the exchange. *To be properly compensated, it must receive the rate of interest based on the debtor's cost of borrowing, not the government's. See Neal,* 789 F.2d at 1286. There is no indication that Congress meant to subsidize debtors undergoing reorganization by making available to them the government's own favorable rate of interest.

Nevertheless, the government overstates its case when it declares that "rates applicable to Treasury obligations ... are wholly irrelevant." Appellant's Opening Brief at 34. *The interest rate on treasury bills is one indicator of the range of prevailing market interest rates. It is an appropriate starting point for calculating the § 1129(a)(9)(C) rate of interest. See 5 Collier on Bankruptcy* par. 1129.02[4][f][i] at 1129–63 n. 45. Moreover, the government's pre-

ferred rate, the § 6621 rate, now will be based on treasury rates. 26 U.S.C. § 6621(a)(2). Rates of interest on treasury obligations reflect the proper return on a riskless loan after adjustment for inflation. Only the estimated cost of deferring present use by the lender and the projected rate of inflation influence this rate. A lender to one other than the government also must include, in his return a significant element to compensate for the risk of default. It follows that treasury rates are relevant to—but not the same as—the § 1129(a)(9)(C) rate.

*Id.* at 1505–06 (Emphasis added at paragraphs four, six and seven).

The Court will thus fix the discount rate based upon what the Debtor would have to pay in the current or prevailing market given all of the terms and conditions of the proposed payout under the plan. To make a "creditor specific" analysis of the various components that make up the secured creditors interest rate such as cost of funds and profit will unduly complicate and burden the process of determining present value with protracted evidentiary hearings relating to the specific secured creditors loan policies, and thus the Court will focus its attention on what the *Debtor* would have to pay in the prevailing market.

An investment in U.S. government obligations is considered a risk free form of investment. As noted by one treatise:

> U.S. Treasury obligations are considered to be free of default risk. For a given maturity, the yield of a treasury obligation establishes the floor yield that other taxable bonds must offer in the market. The greater the default risk, the greater the yield over a treasury obligation of the same current maturity.

STIGUM AND FABOZZI, THE DOW-JONES–IRWIN GUIDE TO MONEY MARKET INSTRUMENTS, pp. 102–103 (DOW JONES–IRWIN, 1987).

The yields on these debt instruments are reported daily from easily obtainable and verifiable sources. They are traded daily not subject to manipulations and reflect a national market. The repayment periods in a given plan can be easily matched against U.S. Treasury obligation of a like maturity.

The Court will thus begin its analysis of what the appropriate discount factor should be by first ascertaining as a baseline what the yield is on a U.S. government obligation that has a term or maturity date comparable to the stretchout proposed by the Debtor in his plan. The Court will then modify that rate upward to reflect the risk factors based on terms and conditions of the Debtor's proposed plan and the equities of the case. This will hopefully give creditors and Debtors some basic guidelines and will help foster agreed plans and reduce the possibility of abuses of discretion and inconsistencies in fixing the discount rate.

A federal court, on its own motion, may take judicial notice of relevant qualified facts at any stage of a proceeding, even though not requested to do so. Fed. R.Evid. 201. *George's Radio and Television Company, Inc. v. Insurance Company of North America*, 536 F.Supp. 681, amended 549 F.Supp. 1014 (D.Md.1982). The doctrine of judicial notice alleviates the necessity of introducing evidence to prove certain facts. It operates as a substitute for formal proof. Fed.R.Evid. 201 is the only evidentiary rule on the subject of judicial notice.

An essential prerequisite for the propriety of taking judicial notice is the *high degree of indisputability* inherent in the nature of the fact. *Atchison, Topeka & Santa Fe Railroad Co. v. U.S.*, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273, (1932) (notice of economic depression in U.S.); *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364 (7th Cir.1983) *cert. denied* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321; *U.S. v. Otley*, 127 F.2d 988 (9th Cir.1942) (climatic conditions). These facts should be so commonly known within the community as to be indisputable among reasonable men. *Id.* The laws of nature are proper subjects for judicial notice. *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir.1972) (habitat of bird adversely affected by flood control project); *Northern Natural Gas Co. v. Grounds*, 441 F.2d 704 (10th Cir.1971) *cert. denied* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267

(Oil is a mixture of hydrocarbons and other substances); *Ikerd v. Lapworth,* 435 F.2d 197 (7th Cir.1970) distances between two places).

■ A judicially noticed fact should be *common knowledge* or capable of *certain verification* through recourse to reliable authority. *Alvary v. U.S.,* 302 F.2d 790 (2nd Cir.1962) (market value of land); *Green v. Warden, U.S. Penitentiary, supra; Transorient Navigators Co., S.A. v. M/S SOUTHWIND,* 788 F.2d 288 (5th Cir. 1986); *U.S. v. United Brothers of Carpenters & Joiners of America, Local 169,* 457 F.2d 210 (7th Cir.1972) *cert. denied* 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (census reports); *George's Radio, supra,* (prejudgment interest calculated by resort to Federal Reserve Bulletin); *Fox v. Kane Miller Corp.,* 398 F.Supp. 609 (D.Md.1975) *aff'd.* 542 F.2d 915 (4th Cir.1976) (decline in purchasing value of dollar since June 3, 1969). The Eighth circuit Court of Appeals in reviewing the propriety of adequate protection payments in a farm Chapter 11 Bankruptcy Case took judicial notice of the average land values in Southwest Minnesota as reported in a highly respected state university publication. *Ahlers v. Northwest Bank Worthington,* 794 F.2d 388 (8th Cir. 1986).

■ A fact which is subject to reasonable dispute is not appropriate for judicial notice. *Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334 (5th Cir.1982) (judicial notice that asbestos inhalation causes asbestosis, reversed); *Citizens for A Better Environment v. U.S. Environmental Protection Agency,* 649 F.2d 522 (7th Cir. 1981); *Meredith v. Fair,* 298 F.2d 696 (5th Cir.1962) (state maintains a policy of segregation). If there is any evidence which reasonably puts a fact in dispute judicial notice will not be taken. P. Rothstein, *Understanding the New Federal Rules of Evidence,* 1973, Supplements 1974, 1975.

The courts have taken judicial notice of federal governmental acts and proceedings, as well as federal governmental records and reports. *North American Van Lines, Inc. v. U.S.,* 412 F.Supp. 782 (N.D.Ind. 1976). Statistical matters have been judi-

cially noticed by federal courts. *Besse v. Burlington Northern, Inc.,* 79 F.R.D. 623 (D.Minn.1978) (present value table and present worth table).

Where a court acts *sua sponte* to take judicial notice, the burden of persuasion rests upon the party who bears the burden of persuasion upon the factual proposition which the noticed fact tends to establish. Care has been taken by the court to identify the fact it is noticing. *Colonial Leasing Co. of New England, Inc. v. Logistics Control Group Intern,* 762 F.2d 454 (5th Cir.1985) on *rehearing* 770 F.2d 479.

■ Procedural fairness demands an opportunity to be heard on the propriety of taking judicial notice. Rule 201 does not provide a formal scheme of giving notice. An adversely affected party may learn in advance that judicial notice is in contemplation, either (1) by virtue of being served with a copy of a request by another party under subdivision (d) or (2) through advance indication by the court. Or, there may be no advance notice at all. In the absence of advance notice, a request made after the fact could not in fairness be considered untimely. Where no hearing was held because the court did not indicate that it was planning to take judicial notice, counsel may (1) ask for a hearing if the case is pending or (2) petition for a rehearing. 1 J. Weinstein & H. Berger, *Weinstein's Evidence,* § 201, 1975.

■ The issues in this case require the Court to determine the appropriate discount factor or the interest rate to be paid by the Debtor to Equitable as a secured creditor in order to find the present value of said secured creditor's allowed secured claims on the effective date of the Debtor's plan pursuant to 11 U.S.C. § 1225. This court takes judicial notice of selected interest rates as announced in the December 14, 1987 Federal Reserve Statistical Release H. 15. *See* appendix "A" attached hereto.

The Court judicially notes pursuant to said statistical release, that the yield on a United States treasury bond maturing in the year 2017, or in approximately 30 years, is 9.31% as of December 14, 1987.

998

This is the length of the proposed stretch-out of the Debtor's mortgage to Equitable.[3]

Thus, the baseline, benchmark or initial component for the discount rate that this Court will use in determining whether the Debtor was giving Equitable present value on its allowed secured claim as of the date of the hearing is 9.31% or the riskless rate on treasury bonds of a like maturity. To that riskless rate the Court would consider a second component or a risk premium based on the risks apparent in the Debtor's plan such as the quality of the security, the loan to value of collateral ratio, the feasibility of the plan, including the amount of debt discharged by a confirmed plan, the length of the stretchout, and the cost, time and difficulty in liquidating the collateral.

 Although, the confirmation of a plan requires a finding of feasibility, there are many unknown variables that affect its actual implementation given the vicissitudes of the economy and the assumptions in the Debtor's plan. Thus, any such "forced loan" is never truly riskless in nature. Equitable is not oversecured. On the contrary, Equitable is clearly undersecured, and thus any confirmed plan as to Equitable's allowed secured claim based on a valuation of $521,265.00 would result in Equitable making a "forced loan" of 100%. That is, there would be no equity cushion and the loan to collateral ratio would be one to one. Certainly no such voluntary loan would normally be made outside the context of a bankruptcy, as most lenders do not make 100% loans. Thus "conventional" market rates are not always a good indicator of the rate mandated on cramdown. *Matter of Landmark*, 7 B.R. 653, 658 (Bankr.D.N.J.1980). When secondary lenders make "100%" loans, normally a higher interest rate is demanded. Thus, the discount factor must reflect the risks inherent in such a loan to value ratio. The real estate is primarily unimproved farm land that will not depreciate by the Debtor's use thereof. Therefore assuming reasonable and prudent farming methods are employed based on the Debtor's testimony, there is no reason to believe the property will not be properly farmed, and therefore decrease in value as a result of waste. However, if the Debtor defaults, unpaid interest and costs of collection can still result in a loss to Equitable. Thus, the Court may have added (without so holding) a risk premium of approximately two points to the base rate of 9.31% in fixing the discount rate in order to arrive at an appropriate discount rate in determining present value of Equitable's allowed secured claim. Accordingly, the Debtor's plan cannot be confirmed as it provides an interest rate of only 8.98%, which is lower than the return an investor could presently receive on a risk-free United States Bond of like maturity.

Some Courts have indicated that the discount rate to be fixed by the Court may be reduced to some extent by the rehabilitation aspects of a Chapter 12 or 13 plan as opposed to a Chapter 11 plan. *See, e.g., In re Fisher*, 29 B.R. 542, 544, *supra*. That is if the Debtor's confirmed plan has been found to be feasible, it is presumed that the Debtor has the ability to complete the plan. The Debtor remains under Court supervision, after considerable debt may have been eliminated, all disposable income must be paid to the trustee, and in turn to the creditors, and no one can proceed versus the Debtor until the stay is vacated, thus eliminating the race to the Court house. *See, also, In re Mitchell*, 39 B.R. 696, 702 (Bankr.D.Ore.1984); *In re Hardzog*, 77 B.R. 840, 842 (Bankr.W.D.Okla.1987). This Court disagrees that the foregoing factors should have much of an influence on the discount rate, and that generally, the best evidence of what a reasonable discount rate is for a given principal, term and risk, is the rate the debtor would pay for such a loan in the marketplace absent the event of bankruptcy. *In re Konzak*, 78 B.R. 990, 992 (Bankr.D.N.D.1987), *See also, Matter of Southern States Motor Inn*, 709 F.2d 647, 652–53, *supra*. The risk of default for reorganizing Debtor may be at least as

---

3. It also noted that Federal Reserve Statistical Release H. 15 of December 14, 1987 reflects that the conventional mortgage rate is presently 10.66%. The Court assumes this means a 30 year residential mortgage with a 20% down payment.

great as that of a nonreorganizing debtor. *U.S. v. Neal Pharmacal,* 789 F.2d 1283, 1288, *supra.* In fact in a Chapter 12 certain risks can be heightened. *Matter of Doud,* 74 B.R. 865, 869 (Bankr.S.D.Iowa 1987); *Matter of Wichmann,* 77 B.R. 718, 721 (Bankr.D.Neb.1987).

Finally, the Court will address for future reference the fact that the Debtor's plan contemplates a 30 year stretchout on the Equitable's mortgage.

■ Section 1222(b)(9) does not *per se* prohibit long term payouts so that the terms of the loan documents are modified. If the mathematical requirements of § 1225(a)(5)(B)(ii) are satisfied and the Debtors show that they can make the payments over the life of the plan pursuant to § 1225(a)(6), the plan is confirmable and can be "crammed down" over the objections of a secured creditor regardless of its normal lending practices and policies or the terms and conditions of the required loan instruments. *See In re White,* 36 B.R. 199, 203 (Bankr.D.Kan.1983), *citing, In re Benson,* 9 B.R. 854 (Bankr.N.D.Ill.1981), *In re Hollanger,* 15 B.R. 35 (Bankr.W.D.La. 1981), and *Wachovia Bank and Trust Co. v. Harris,* 455 F.2d 841 (4th Cir.1972). *See also, In re O'Farrell,* 74 B.R. 421, 423–24, *supra; In re Retzlaff,* 64 B.R. 137, 140 (Bankr.N.D.Iowa 1986); *In re Mulnix,* 54 B.R. 481, 484 (Bankr.N.D.Iowa 1985); *In re Timber Tracts, Inc.,* 70 B.R. 773, 778 (Bankr.D.Mont.1987), and *In re Martin,* 66 B.R. 921 *supra,* which has a lengthy discussion of § 1129 and pursuant to § 1129(b) confirmed the debtor's plan which restructured a secured creditor's note and mortgage from seven to twenty years over the objection of the secured creditor. The *Martin* court quoted with approval from *In re Hollanger,* 15 B.R. 35, 47 *supra,* where the court stated:

As one commentary has noted, bankruptcy courts may "cramdown" feasible plans of reorganization under the Bankruptcy Code, where such plans seek to achieve restructuring of mortgage debts secured by real estate, as follows:

(1) the term of any mortgage debt may be extended;

(2) payments required by the mortgage debt of either principal or interest may be postponed; and

(3) deferred or reduced payments of principal or interest may be added to the mortgage balance.

*Id.* at 930.

Section 1222(b)(2) expressly provides that the plan may modify any lien. Sections 1222(b)(3) and (5) state any default may be cured or waived. Thus, once the Debtor has otherwise complied with the "cramdown" requirements of § 1225 all of the foregoing may be accomplished by the Debtor's plan as it relates to Equitable's mortgage.

As stated by the Court in *In re Pikes Peak Water Co.,* 779 F.2d 1456 (10th Cir. 1985):

"... the dissenting secured claimant will be receiving the 'indubitable equivalent' ... Stated another way, where a dissenting claimant is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all the law requires, that is ... full payment over a reasonable period of time."

*Id.* at 1461 (*quoting, In re Hollanger,* 15 B.R. 35, 46–47 *supra* ).

It should also be noted that the "stretchout" of the loan to make the plan payment period thirty years would not be unreasonable given the fact that conventional farm mortgages are often lengthy and pursuant to the Debtor's unrefuted testimony the land is in good condition.

The Court cannot rewrite the Debtor's plan. It can only either deny or confirm the plan as written. Thus, the confirmation of the Debtor's plan is hereby DENIED.

SO ORDERED. And it is further

ORDERED, that either party shall have 10 days from the date of the entry of this Order to object to any matters which the Court took judicial notice of in this opinion pursuant to Fed.R.Evid. 201(e). And it is further

ORDERED, that the Debtor is hereby granted thirty (30) days to file its second amended plan and failing to do so the Court may dismiss this case without further notice and hearing.[4]

4. In the event that the Debtor amends its plan as to the discount rate in accordance with this Order, the Court will take no further evidence or entertain any further objections on that issue or any of the other provisions of § 1225, and will proceed to determine if the plan is feasible given the amended discount rate based on the evidence submitted at the hearing. The Court will also determine as a matter of law whether the plan complies with all of the other applicable provisions of Chapter 12 and Title 11 pursuant to § 1225(a)(1) (this would relate to Article 3.3C of the Debtor's plan, *See* § 1225(a)(5)(B)(i)), as well as clause "C" (p. 6), regarding full payment and injunctions, and Article 5.5 to the extent the Debtor could do certain things not in the ordinary course of business without Court approval.

APPENDIX A

# FEDERAL RESERVE statistical release

**RECEIVED**
**DEC 21 1987**

These data are released each Monday. The availability of the release will be announced when the information is available, on (202) 452-3208.

H.15 (519)

**SELECTED INTEREST RATES**
Yields in percent per annum

SHARON A. JAMES, Clerk
U. S. BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA

For immediate release
December 14, 1987

| Instruments | 1987 DEC 7 | 1987 DEC 8 | 1987 DEC 9 | 1987 DEC 10 | 1987 DEC 11 | This week | Last week | 1987 NOV |
|---|---|---|---|---|---|---|---|---|
| FEDERAL FUNDS (EFFECTIVE)[1] | 6.93 | 6.79 | 6.72 | 6.83 | 6.81 | 6.84 | 6.89 | 6.69 |
| COMMERCIAL PAPER[2] [3] | | | | | | | | |
| 1-MONTH | 7.60 | 7.66 | 7.78 | 7.83 | 8.00 | 7.77 | 7.28 | 6.77 |
| 3-MONTH | 7.49 | 7.57 | 7.64 | 7.71 | 7.81 | 7.64 | 7.47 | 7.17 |
| 6-MONTH | 7.45 | 7.50 | 7.55 | 7.59 | 7.69 | 7.56 | 7.42 | 7.17 |
| FINANCE PAPER PLACED DIRECTLY[2] | | | | | | | | |
| 1-MONTH | 7.30 | 7.36 | 7.43 | 7.69 | 7.62 | 7.48 | 6.67 | 6.63 |
| 3-MONTH | 6.93 | 6.98 | 6.99 | 7.03 | 6.81 | 6.95 | 7.17 | 6.91 |
| 6-MONTH | 6.55 | 6.60 | 6.60 | 6.63 | 6.63 | 6.60 | 6.59 | 6.69 |
| BANKERS ACCEPTANCES (TOP RATED)[2] | | | | | | | | |
| 3-MONTH | 7.53 | 7.58 | 7.58 | 7.71 | 7.78 | 7.64 | 7.41 | 7.07 |
| 6-MONTH | 7.50 | 7.49 | 7.50 | 7.63 | 7.70 | 7.56 | 7.37 | 7.07 |
| CDS (SECONDARY MARKET) | | | | | | | | |
| 1-MONTH | 7.68 | 7.80 | 7.88 | 7.91 | 8.12 | 7.88 | 7.72 | 6.80 |
| 3-MONTH | 7.58 | 7.72 | 7.78 | 7.77 | 7.89 | 7.75 | 7.61 | 7.24 |
| 6-MONTH | 7.61 | 7.73 | 7.83 | 7.80 | 7.92 | 7.78 | 7.62 | 7.31 |
| BANK PRIME LOAN[1] [4] | 8.75 | 8.75 | 8.75 | 8.75 | 8.75 | 8.75 | 8.75 | 8.78 |
| DISCOUNT WINDOW BORROWING[1] [5] | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| U.S. GOVERNMENT SECURITIES | | | | | | | | |
| TREASURY BILLS | | | | | | | | |
| AUCTION AVERAGE[2] [6] | | | | | | | | |
| 3-MONTH | 5.81 | | | | | 5.81 | 5.49 | 5.81 |
| 6-MONTH | 6.42 | | | | | 6.42 | 6.12 | 6.23 |
| 1-YEAR | | | | | | | | 6.48 |
| AUCTION AVERAGE(INVESTMENT)[6] | | | | | | | | |
| 3-MONTH | 6.00 | | | | | 6.00 | 5.66 | 6.00 |
| 6-MONTH | 6.75 | | | | | 6.75 | 6.42 | 6.54 |
| SECONDARY MARKET[2] | | | | | | | | |
| 3-MONTH | 5.82 | 5.86 | 5.83 | 5.92 | 5.86 | 5.86 | 5.41 | 5.69 |
| 6-MONTH | 6.44 | 6.43 | 6.40 | 6.47 | 6.47 | 6.44 | 6.15 | 6.19 |
| 1-YEAR | 6.71 | 6.72 | 6.69 | 6.81 | 6.79 | 6.74 | 6.55 | 6.50 |
| TREASURY CONSTANT MATURITIES[7] [8] | | | | | | | | |
| 1-YEAR | 7.20 | 7.21 | 7.18 | 7.32 | 7.30 | 7.24 | 7.02 | 6.96 |
| 2-YEAR | 7.86 | 7.88 | 7.88 | 8.00 | 8.02 | 7.93 | 7.75 | 7.69 |
| 3-YEAR | 8.16 | 8.15 | 8.15 | 8.29 | 8.31 | 8.21 | 8.04 | 7.99 |
| 5-YEAR | 8.48 | 8.49 | 8.47 | 8.63 | 8.65 | 8.54 | 8.40 | 8.35 |
| 7-YEAR | 8.90 | 8.91 | 8.88 | 9.05 | 9.08 | 8.96 | 8.80 | 8.69 |
| 10-YEAR | 9.07 | 9.09 | 9.05 | 9.23 | 9.28 | 9.14 | 8.98 | 8.86 |
| 30-YEAR | 9.22 | 9.26 | 9.22 | 9.40 | 9.45 | 9.31 | 9.12 | 8.95 |
| COMPOSITE | | | | | | | | |
| OVER 10 YEARS(LONG-TERM)[9] | 9.23 | 9.25 | 9.23 | 9.39 | 9.44 | 9.31 | 9.14 | 8.99 |
| CORPORATE BONDS | | | | | | | | |
| MOODY'S SEASONED | | | | | | | | |
| AAA | 10.05 | 10.10 | 10.11 | 10.20 | 10.26 | 10.14 | 10.06 | 10.01 |
| BAA | 11.25 | 11.25 | 11.24 | 11.34 | 11.43 | 11.30 | 11.23 | 11.23 |
| A-UTILITY[10] | | | | | | 10.70 | 10.42 | 10.39 |
| STATE & LOCAL BONDS[11] | | | | | 8.10 | 8.10 | 7.90 | 7.95 |
| CONVENTIONAL MORTGAGES[12] | | | | | | 10.66 | 10.60 | 10.65 |

1. Weekly figures are averages of 7 calendar days ending on Wednesday of the current week; monthly figures include each calendar day in the month.
2. Quoted on bank-discount basis.
3. Rates on commercial paper placed for firms whose bond rating is AA or the equivalent.
4. Rate charged by banks on short-term business loans.
5. Rate for the Federal Reserve Bank of New York.
6. Auction date for daily data; weekly and monthly averages on issue-date basis.
7. Yields on actively traded issues adjusted to constant maturities. Source: U.S. Treasury.
8. See reverse for a description of the constant maturity series. The 20-year constant maturity yield was discontinued at the end of 1986 because the Treasury no longer issues a 20-year bond.
9. Unweighted average of all issues outstanding of bonds neither due nor callable in less than 10 years, including one very low yielding "flower" bond.
10. Estimate of the yield on a recently offered, A-rated utility bond with a maturity of 30 years and call protection of 5 years; Friday quotations.
11. Bond Buyer Index, general obligation, 20 years to maturity, mixed quality; Thursday quotations.
12. Contract interest rates on commitments for fixed-rate first mortgages. Source: FHLMC.
Note: Weekly and monthly figures are averages of daily rates, except for state & local bonds, which are based on Thursday figures, and conventional mortgages and A-utility bonds, both of which are based on Friday figures.

PETTINGER A. JAMES, Clerk
BANKRUPTCY COURT
AFFAIRT TO DIST. OF INDIANA

## SELECTED INTEREST RATES
### YIELDS IN PERCENT PER ANNUM

WEEK ENDING WEDNESDAY

| | WEEK ENDED | | 4 WEEKS ENDED | |
|----------------------------------|------------|--------|---------------|---------|
| | 1987 : DEC 9 : | 1987 : DEC 2 : | 1987 : DEC 9 : | 1987 NOV 11 |
| FEDERAL FUNDS (EFFECTIVE) 1/ | 6.84 : | 6.89 : | 6.82 : | 6.88 |
| 3-MONTH TREASURY BILL 2/ | 5.66 : | 5.47 : | 5.68 : | 5.68 |
| 3-MONTH COMMERCIAL PAPER 2/ | 7.52 : | 7.45 : | 7.31 : | 7.51 |
| 3-MONTH CD (SECONDARY MARKET) | 7.64 : | 7.60 : | 7.40 : | 7.60 |
| 3-MONTH EURODOLLAR 3/ | 7.84 : | 7.71 : | 7.58 : | 7.84 |

1. FEDERAL FUNDS RATES ARE AVERAGES OF EFFECTIVE RATES FOR SEVEN CALENDAR DAYS ENDING ON WEDNESDAY.
2. QUOTED ON BANK DISCOUNT BASIS. "
3. FOR INDICATION PURPOSES ONLY.

## DESCRIPTION OF THE TREASURY CONSTANT MATURITY SERIES

YIELDS ON TREASURY SECURITIES AT "CONSTANT MATURITY" ARE ESTIMATED FROM THE TREASURY'S DAILY YIELD CURVE. THIS CURVE, WHICH RELATES THE YIELD ON A SECURITY TO ITS TIME TO MATURITY, IS BASED ON THE CLOSING MARKET BID YIELDS ON ACTIVELY-TRADED TREASURY SECURITIES IN THE OVER-THE-COUNTER MARKET. THESE MARKET YIELDS ARE CALCULATED FROM COMPOSITES OF QUOTATIONS REPORTED BY FIVE LEADING U.S.GOVERNMENT SECURITIES DEALERS TO THE FEDERAL RESERVE BANK OF NEW YORK. THE CONSTANT YIELD VALUES ARE READ FROM THE YIELD CURVE AT FIXED MATURITIES, CURRENTLY 1, 2, 3, 5, 7, 10, AND 30 YEARS. THIS METHOD PERMITS ESTIMATION OF THE YIELD FOR A 10-YEAR MATURITY, FOR EXAMPLE, EVEN IF NO OUTSTANDING SECURITY HAS EXACTLY 10 YEARS REMAINING TO MATURITY.