In re **BUTTONWOOD PARTNERS, LIMITED, as Successor–In–Interest to Buttonwood Tree Partners, Debtor.**

**Bankruptcy No. 87 B 12458 (BRL).**

United States Bankruptcy Court, S.D. New York.

Feb. 28, 1990.

Hahn & Hessen Attorneys for Debtor New York City by Gilbert Backenroth, Joseph A. Vogel, David J. Ciminesi, for debtor.

Cleary, Gottlieb, Steen & Hamilton, New York City by Joseph Lamport, Joshua Rawson, for Ben Franklin Financial Corp.

Haynes and Boone, Attorneys for Southwest Savings Bank Dallas, Tex., by Susan L.S. Ernst, for Southwest Sav. Bank.

Pryor, Cashman, Sherman & Flynn, New York City by Mark R. Jacobs, Debra Kramer, for Glenfed Development Corp.

Morgan, Lewis & Bockius, New York City by William Hayes, for First American Bank.

Latham & Watkins, New York City by Martin N. Flics, for Entrepreneurial Capital Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON OBJECTION TO CONFIRMATION OF A PLAN

BURTON R. LIFLAND, Chief Judge.

### BACKGROUND

On January 16, 1990, this Court approved the second amended Disclosure Statement which had been filed jointly by Buttonwood Partners, Limited (the "Debtor") and Ben Franklin Financial Corporation ("Ben Franklin"), one of the Debtor's secured creditors. Votes were solicited under the Disclosure Statement in order to obtain confirmation of the proposed second amended Plan of Reorganization (the "Plan").

The Plan provides that the Debtor will be reorganized with Ben Franklin, or its nominee, being appointed general partner of the reorganized partnership. The reorganized partnership will retain the Buttonwood I property among other things. The Buttonwood I property will remain subject to a first mortgage held by Southwest Savings Association ("Southwest"), a second mortgage held by First American Savings Bank, and a third mortgage presently held by Southwest but, pursuant to the Plan, to be purchased by Ben Franklin. In addition to Southwest retaining a lien on Buttonwood I to the full extent of its allowed secured claim, all outstanding interest accrued and due as of the effective date of the Plan will be capitalized with the total representing the principal amount to be paid to Southwest under the Plan. The Plan proposes that the Southwest note be amortized over six years with an extension of the term for two additional years at the reorganized partnership's option. Under the Plan, Southwest's claim will be paid in full within a maximum of eight years. Although Southwest had aggressively negotiated for treatment under the Plan, it has nevertheless, filed an objection to Confirmation (the "Objection").

Southwest has a claim in Class I for its first mortgage, which by its own admission is fully secured (the "Class I Claim"). Southwest also had a claim in Class III for its third mortgage, which would be purchased by Ben Franklin under the Plan (the "Class III Claim"). Southwest voted to reject confirmation of the Plan as to its Class I Claim, and voted to accept the Plan as to its Class III Claim even though it had negotiated the treatment of its two claims as one package. The Plan proposes to pay Southwest a slightly lower interest rate on its Class I Claim than the rate to be paid to the second mortgagee for its claim.

Subsequent to the negotiated agreement as to Southwest's treatment under the Plan, on August 9, 1989, President Bush amended the Home Owners' Loan Act of 1933 ("HOLA") by signing the Financial Institutions Reform, Recovery and Enforcement Act of 1989, *Pub.L.* No. 101–73, 103 *Stat.* 183 ("FIRREA") in order to enhance the federal regulators' ability to respond to the fiscal problems of state sav-

ings and loan associations. It is presumed that Southwest is a "State savings association" as that term is defined in FIRREA, Pub.L. No. 101–73 § 204(b)(3), 103 State. 183, 190. As an insured State savings association, Southwest is subject to the regulatory framework set forth in FIRREA.

Southwest alleges that unless this Court finds otherwise, it cannot participate in the Plan without violating § 5(u) HOLA, as amended by FIRREA, and applicable regulations. It appears that because of the ambiguities regarding the interpretations of the various regulations discussed herein, Southwest was forced to take the *most conservative* of possible positions, and therefore, was precluded from voting in favor of the Plan's treatment of its Class I Claim in order not to have been deemed to have violated the regulations by the Office of Thrift Supervision ("OTS")[1]. Simply put, one can surmise that Southwest had been placed between "a rock and a hard place" under the FIRREA regulation because if it failed to object to the confirmation of the Plan, it could conceivably be subjected to the imposition of civil money penalties theoretically assertable against a broad group related to an institution which violates any applicable law or regulation. For example, violations which constitute part of a "pattern of misconduct" may subject an institution and any "institution affiliated party" to increased civil money penalties of up to $25,000 per day. Southwest maintains that it has not found any authority concerning the minimum number of violations sufficient to constitute a "pattern of misconduct." Moreover, Southwest states that it has no knowledge of any special exceptions to the liability provisions of FIRREA for statutory or regulatory violations occurring as a result of participation in a confirmed plan of bankruptcy. Thus, even though it may be that Southwest is satisfied by the manner in which its Class I Claim is treated under the Plan, it is precluded from voluntarily accepting the Plan for fear of violating the applicable

regulations under FIRREA. A cramdown scenario is therefore the only course to which the association can be subjected to under these circumstances.

Southwest offers two challenges to the confirmation of the Plan. First, it argues that by virtue of § 1129(a)(3) of the Bankruptcy Code (the "Code"), this Court cannot confirm any plan of reorganization proposed "by any means forbidden by law." Second, Southwest has objected to confirmation of the Plan contending that the Plan's proposed treatment of its Class I Claim violates both §§ 1129(b)(1) and 1129-(b)(2)(A)(i)(II).

## DISCUSSION

### I. *Section 1129(a)(3).*

■ This Court disagrees with Southwest's unwarranted narrow reading of § 1129(a)(3) to preclude the confirmation of the Plan. Section 1129(a)(3) reads in full as follows: "[t]he court shall not confirm a plan if ... (3) [t]he plan has not been proposed in good faith and not by any means forbidden by law." Southwest does not assert that the Plan has not been proposed in good faith. Rather, Southwest asserts that the Plan's treatment of Southwest's Class I Claim is in direct violation of the requirements of FIRREA as applicable to Southwest. (*See,* attached Appendix for a summary of the applicable regulations which may be implicated by the treatment of Southwest's Class I Claim in the Plan.) However, there is no requirement imposed by § 1129(a) that the contents of a plan comply in all respects with the provisions of all nonbankruptcy laws and regulations. "Section 1129(a)(3) speaks only to the proposal of a plan...." 5 *Collier On Bankruptcy,* ¶ 1129.02, 129–23 (15th ed. 1989). Section 1129(a)(3) is derived from § 221(3) of the Bankruptcy Act which stated that the court could confirm a plan if satisfied that "the proposal of the plan and its acceptance are in good faith and have not been made or procured by means or prom-

---

1. In Thrift Bulletin 32–1 ("TB 32–1") the OTS states that generally, it "will not take any supervisory action if the savings association's documentation demonstrates that it has taken the most conservative position during the time period from passage of FIRREA until" the OTS issues more comprehensive regulations on the subject.

ises forbidden by this Act." Consequently, given the relationship between § 221(3) of the Act and § 1129(a)(3), it must be construed that the term "means forbidden by law" subsumes some conduct in connection with obtaining confirmation of such proposal. The enlargement from "forbidden by this Act" to "forbidden by law" merely " 'requires that the proposal of the plan comply with all applicable law, not merely the bankruptcy law.' " *In re Koelbl,* 751 F.2d 137, 139 (2d Cir.1984) (quoting 5 *Collier on Bankruptcy* ¶ 1129.02, at 1129–13 (15th ed. 1984). Indeed, § 1123 clearly contemplates that a plan may impair a class of claims "[n]otwithstanding any other applicable nonbankruptcy law;" an event occurring here. Moreover, § 1129(a)(6) specifies only that a plan which deals with rate changes (*i.e.,* a public utility) must obtain requisite regulatory approval relating to proposed rate changes, by implication leaving the bankruptcy court free to consider and decide all other non rate change issues arising in connection with confirmation of a plan.

Moreover, it is not clear that confirmation of the Plan would be in violation of FIRREA regulations, goals and policies. (*See,* attached Appendix.) However, one thing is obvious; Southwest has been forced to address these difficult issues in a climate of extreme uncertainty. First, FIRREA imposes on savings associations the loans-to-one-borrower ("LTOB") limitation set forth in 12 C.F.R. § 563.9–3 (recodified at 12 C.F.R. § 563.93) that it applies to national banks, but does not establish a transition period for implementation of the new LTOB limits for savings associations. Second, there are aspects of the new requirements that, while reasonable for national banks, would either work a hardship on savings associations or are simply not relevant to these entities and their businesses. The respective roles of the OTS and the Office of the Comptroller of the Currency ("OCC") in establishing new rules and interpreting existing rules for savings associations are still evolving. It is in this context that Southwest, perhaps defensively, is applying the FIRREA to the instant situation. However, by applying the FIRREA standards mechanically, Southwest ignores the fact that the application of the FIRREA LTOB limits in the Chapter 11 context would be directly contrary to FIRREA's underlying policy goals.

FIRREA was enacted to address the current savings and loan financial crisis, in part, by *prospectively* subjecting savings institutions to the same LTOB limitations applicable to national banks. *See,* FIRREA, Title I—Purpose of the Act § 101. The legislative goal was to limit thrift institutions' participation in higher risk investments and loans. As the analysis used by Southwest in its Objection demonstrates, existing loans are generally *not* affected by the new regulations. It would therefore be consistent with the legislative policy to similarly exempt Chapter 11 loan restructuring from the LTOB limits so as to maximize the potential for an enhanced recovery.

"[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982); *see also,* 2A J. Singer, *Sutherland Statutory Construction,* § 45.12. (4th ed. 1984).

Indeed, application of the LTOB limits in bankruptcy could have the paradoxical result of precluding thrift lenders from achieving the most favorable treatment of their claims. Were FIRREA to apply to the restructuring of loans in the bankruptcy context, secured creditors such as Southwest would be unable to participate in plan negotiations but would nevertheless be subject, as Southwest is here, to cramdown under Section 1129(b). In such circumstances, rather than being able to negotiate and vote for favorable treatment for its outstanding loan, a savings institution would be subject to cramdown on terms that could be markedly less favorable.

This case is a perfect example of the benefits of allowing a secured creditor to participate in negotiating a reorganization plan because it is abundantly clear that

under the circumstances, no other creditor has been treated as favorably as Southwest has under the Plan. It is also obvious that Southwest is being extremely prudent in light of the possible consequences of not taking the most conservative position as articulated pursuant to TB 32–1. Although based upon these peculiar circumstances, Southwest may be justified in objecting to the confirmation of the Plan, there has not been demonstrated the existence of a compelling nonbankruptcy policy interest that must prevail.

Moreover, it is evident that there is an intention by the OTS to be more flexible in its application of the regulations during this transitional period, which Southwest fails to acknowledge. Evidence of OTS's intention in this regard is articulated in the recent testimony by Jordan Luke, Chief Counsel of the OTS before a congressional subcommittee in which certain issues which are currently before this Court were discussed. *See, Hearings Before the Subcomm. on General Oversight and Investigations of the House Comm. on Banking, Finance and Urban Affairs*, 101st Cong., 2d Sess., Feb. 7, 1990 (Statement of Jordan Luke, Chief Counsel, OTS). Jordan Luke ended his discussion of various transition issues, including the renewal/restructuring policy set forth in TB 32–1, with the reminder that:

> like any executive agency, OTS retains case-by-case discretion with respect to its determination to take supervisory or enforcement action against a savings association for a violation of applicable lending limitations.... [T]he decision to exercise such supervisory and enforcement discretion would require a thorough consideration of the safety and soundness concerns involved in a particular case, as well as the nature and extent of a given violation.

*Id.* at 11–12.

This Court finds that the goals of FIRREA are not inapposite to the goals of

bankruptcy which have been articulated as follows:

> [T]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) which stated '[the fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'

*In re Ionosphere Clubs Inc.*, 98 B.R. 174, 176–77 (Bankr.S.D.N.Y.1989) (quoting *Bildisco & Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197).

■ Although there are no reported cases on point with the situation herein, the analysis used in the case of *In re MCorp.*, 101 B.R. 483 (S.D.Tex.1989) is analogous and therefore quite helpful. The situation in *MCorp.* was in the context of a bank holding company who was seeking reorganization under the Code. In this regard, the issue before the district court was whether the general bankruptcy processes supersede the processes of the agencies that regulate banking. The court held that its "power over the entirety of the debtor's estate took precedence" over the authority vested in the Federal Reserve System's Board of Governors under Title 12. *Id.* at 487. Likewise, assuming, *arguendo*, that there is a contradiction between the two government statutory schemes, this Court finds that its jurisdiction and power over the debtor's estate takes precedence over the authority vested in the OTS under Title 12[2]. A result which would preclude this Court from considering a balancing with respect to the application of the specific regulations that *may* be implicated, would interfere with the ability of this Debtor to effectively reorganize under chapter 11 and contradict the "fresh-start" policy which underlies the Code.

---

**2.** In this regard, this Court's authority to consider the applicability of the provisions of FIRREA in a bankruptcy context can also be construed from § 105(a) of the Code, which provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

## II. CRAMDOWN.

Code § 1129(a)(8) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(8) With respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

Since Southwest's Class I Claim is the only claim in the class, and the claim is impaired, its vote rejecting the Plan means that the proposed Plan has not met all of the requirements for confirmation under Code § 1129(a) because § 1129(a)(8) has not been complied with.

Code § 1129(b), in part, provides:

(b)(1) Notwithstanding section .510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property....

Southwest's Objection, as to the nonconfirmability of the Plan under § 1129(b) of the Code, is based on the Plan's proposal to pay a slightly lower rate of interest on Southwest's Class I Claim than the rate of interest proposed to be paid to the Class II claimant.

Although Southwest cites Code § 1129(b)(2)(A)(i)(II) as one of the bases of its objection to confirmation, it makes no argument that the statutory language has not been complied with. Normally when citing this section, the secured creditor bases its objection on the interest rate applied to the cash payments, arguing that the rate is insufficient to provide "payments totaling at least the allowed amount of such claim". Alternatively, the secured creditor would allege that the plan undervalued its collateral so that the payments to it under the plan did not provide "at least the value of such holder's interest in the estate's interest in such property". Here, Southwest has made neither of these allegations, nor indeed any allegations which would prevent confirmation of the Plan under Code § 1129(b)(2)(A)(i)(II).

The requirement found in Code § 1129(b)(1) that a plan does not "discriminate unfairly" is intended to complement the "fair and equitable" test and to compensate for the complex priorities among classes. In essence, a plan does not "discriminate unfairly" with respect to a dissenting class if the plan protects the legal rights of such class in a manner consistent with the treatment of other classes whose legal rights are interrelated with the rights of the dissenting class. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 416–417 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

The requirement of the House bill that a plan not "discriminate unfairly" with respect to a class is included for clarity; the language in the House report interpreting that requirement, in the context of subordinated debentures, applies equally under the requirements of section 1129(b)(1) of the House amendment.

124 Cong.Rec. H11,104 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,420 (daily ed., Oct. 6, 1978).

■ Most courts that have dealt with the "discriminate unfairly" provision of Code § 1129(b)(1) have done so in the context of unsecured claims and their permissible classification. *See, In re Granada Wines, Inc.*, 748 F.2d 42 (1st Cir.1984) (pension fund claim and other general unsecured claims must be treated alike); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982) (mortgage deficiency claim and trade claims must be treated alike). Some courts hold that for discriminatory treatment of claims to be fair, four tests must be satisfied: (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale. *In re Ratledge*, 31 B.R. 897 (E.D.Tenn.1983); *In re Rochem, Ltd.*, 58 B.R. 641 (Bankr.D.N.J.1985).

■ Using the tests set forth above as an analytical framework to consider the present Plan, the proposed treatment of Southwest's Class I Claim does not "discriminate unfairly". First, there is a reasonable basis for discrimination. Unlike unsecured claims, every secured claim is different. Secured claims usually are secured by different collateral and usually have different priorities even if secured by the same collateral. This fact leads to the permissibility of individualized treatment based on the particularities of each secured claim. The second test set forth above is not a determinative test in this Court's opinion, but in keeping with the analytical framework will be applied here. The present case has a long history and it has not been shown that a plan could be consummated without the slight difference in treatment between Class I and Class II proposed under this Plan.

Third, the discrimination proposed here has been arrived at through good faith bargaining. Southwest was involved in the negotiations leading to the Plan as proposed. There were certain tradeoffs involving the treatment of Southwest's Class I and Class III claims, along with the claims of other secured creditors in reaching what was a consensual plan of reorganization. If anything, there may be a suggestion of bad faith by Southwest in the confirmation process raised by its voting to reject the Plan with its Class I Claim *while voting to accept* the Plan with its Class III Claim.

Fourth, the degree of discrimination is in direct proportion to its rationale. Here, the slight degree of "discrimination" is justified. The difference in interest rates can be attributed to a slightly higher degree of risk that the Class II claimant bears because of its second priority status.

The only case cited by Southwest in support of its objections based on § 1129(b) is *In re Dilts*, 100 B.R. 759 (Bankr.W.D.Pa. 1989). Although the case may seem similar to the present situation, it is distinguishable and not applicable here. The *Dilts* Court stated:

> [T]he debtors' plan would leave unimpaired a junior secured claim on their residence while it would impair the first mortgage lien.
>
>    \*     \*     \*     \*     \*     \*
>
> We find no support in the Code for the proposition that debtors may impair an oversecured creditor, over its objections, by reducing the interest rate and extending the term of the repayment period while a junior mortgageholder on the same property is to receive payment in full over an extended period at a higher interest rate than that proposed to the first mortgageholder.

*Id.* at 760–61. In the present Plan, both Class I and Class II claimants are impaired. Moreover, from the credible testimony adduced at the confirmation hearing, this Court finds that the proposed rate to be paid on Southwest's Class I Claim is a fair and reasonable reflection of the market rate.

In accordance with the foregoing discussion, this Court finds that the Debtor's Second Amended Plan of Reorganization is

Confirmable under Code § 1129(a) and (b) notwithstanding the filed Objection.

In accordance with the foregoing, submit an order of confirmation.

## APPENDIX

### SUMMARY OF THE APPLICABLE FIRREA REGULATIONS

A.  The LTOB Limitation.

Among other requirements, FIRREA mandates lending limits to one borrower ("LTOB"). The LTOB limits prohibit "total loans and extensions of credit" to one borrower over the greater of $500,000.00 or certain percentages of "unimpaired capital" and "unimpaired surplus". The term "loans and extensions of credit" means:

all direct or indirect advances of funds to a person made on the basis of any obligation of that person to repay the funds or repayable from specific property pledged by or on behalf of the person....

12 U.S.C. § 84(b)(1).

The OTS constitutes the primary regulator for savings associations. Thrift Bulletin 32–1 ("TB 32–1") issued by the OTS, and dated December 5, 1989, provides that "[s]avings associations' management shall apply the OCC's lending limit regulations and codified opinions" except to the extent that the former LTOB limitation set forth at 12 C.F.R. § 563.9–3 (recodified at 12 C.F.R. § 563.93) is more restrictive. In TB 32–1, the OTS further states that generally it "will not take any supervisory action if the savings association's documentation demonstrates that it has taken the *most conservative* position during the time period from passage of FIRREA until" the OTS issues more comprehensive regulations on the subject (emphasis added). However, there is a division of authority as to the correct interpretation of TB 32–1, which seemingly permits reliance upon the OCC's loan renewal policy, while at the same time compelling compliance with the requirement of 12 C.F.R. § 563.9–3. For example, TB 32–1 provides that "with respect to any loan that was legal when made, such loan *may be renewed* in accord-

ance with the OCC's loan renewal policy as described [in TB 32–1]." (emphasis added). TB 32–1 notes that the OTS will give substantial weight to noncodified legal opinions issued by the OCC, although the OTS will not regard these opinions as legally binding on savings associations.

While LTOB limitations certainly apply to new loans, the restrictions generally do not apply to renewals or modifications of existing loans. TB 32–1 states that: "a renewal of a loan is generally not regarded as the equivalent of a new loan at the time of renewal for lending limit purposes, provided: (i) no new funds are advanced by the association to the borrower, (ii) a new borrower is not substituted for the original obligor".

Consequently, inasmuch as the amount of Southwest's allowed secured Class I Claim exceeds Southwest's LTOB limit of $500,000.00, Southwest alleges that it *may* violate the LTOB regulations if its participation in the treatment accorded to its claim in the Plan constitutes a "new" loan or extension of credit subject to LTOB limitations rather than a "renewal" or a "modification" of an existing loan.

Under current regulations and pronouncements by the OTS, as well as the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"), Southwest asserts that the following elements of the Plan may cause its participation in the Plan to constitute a "new" loan subject to the application of LTOB limitations: (i) the capitalization of past due and accrued interest, and (ii) the substitution of obligors.

### (i) Capitalization of Accrued and Past Due Interest.

The Plan's proposed treatment of Southwest's Class I Claim contemplates the capitalization of all interest which has accrued and become due and payable prior to the effective date of the Plan, as opposed to paying in full all past due interest at the time of confirmation of the Plan.

The OCC has adopted the position that the capitalization or deferral of past due interest does not cause a modification of an existing loan to result in the origination of a new loan for purposes of application of lending limits. *See,* 12 C.F.R. § 32.108 ("[t]he lending limits do not apply to the portion of a loan or extension of credit that represents accrued or discounted interest"). In an unpublished letter dated September 10, 1984, reflecting this position, the OCC stated that it "does not regard the mere capitalization or financing of interest as transforming the transaction into a new lending in violation of [lending limits]." In reaching its determination, the OCC reasoned that "past due interest does not represent bank funds which have been loaned out at risk [citation omitted]."

In contrast, however, the FSLIC and FHLBB have adopted a position contrary to that of the OCC. Section 563.9–3 of the Rules and Regulations for FSLIC–Insured Institutions defined "outstanding loans" to include "interest due and unpaid...." The OTS' successor regulation, 12 C.F.R. § 563.93, contains the same language. A Memorandum issued by the FHLBB dated July 5, 1988, clarifying FHLBB Memorandum No. R 73 ("R–73"), regarding waiver of LTOB limitations, also reflects this position. However, the July 5, 1988 FHLBB Memorandum states that "[a]ny increase in the principal amount of the original loan *or accrual of past due interest, constitutes a new loan....*" (emphasis added).

As noted earlier, TB 32–1 directs savings associations to apply the more conservative lending limit in granting loans and extensions of credit. It cannot be disputed that the approach adopted by the FHLBB and the FSLIC constitutes the more conservative position with respect to the treatment of the capitalization of past due interest. Moreover, Southwest asserts that despite repeated requests for clarification, to date the OTS has declined to render any guidance in this area. Thus, in light of the warning by the OTS that a savings association must apply the more conservative lending limit until the OTS issues comprehensive regulations on this subject, Southwest has expressed great concern that the capitalization of accrued interest contemplated by the Plan could render Southwest's participation in the Plan as a "new" loan in violation of LTOB limitations applicable to Southwest.

### (ii) *Substitution of Obligors.*

Southwest also maintains that depending upon the interpretation of the applicable regulations, it appears that substitution of obligors *may* occur in connection with the implementation of the Plan. As mentioned previously, TB 32–1 clearly states that if obligors are substituted, this will cause a loan to be considered a "new" loan which is subject to application of LTOB limitations, rather than a "renewal" or "modification" of a loan.

At the time of the origination of the loan, Buttonwood Tree Partners, Ltd., was named as obligor. In 1988, this Court entered an order approving a transaction involving the transfer of title of the Debtors' properties, including Buttonwood I, to Buttonwood Partners, Ltd. In addition, the Plan contemplates that, on the effective date, Messrs. Rosenberg and Grigoli will resign as general partners of Buttonwood Partners, Ltd. and S.P.R.C., Inc. shall be appointed as a substitute general partner.

Regulations promulgated by the OCC provide that "[l]oans" or extensions of credit to a partnership ... shall, for purposes of [application of lending limits], be considered loans or extensions of credit to each member of such partnership...." 12 C.F.R. § 32.5(c)(1). TB 32–1 states that a modification of a loan involving the addition of obligors does not constitute a "new" loan for LTOB limitation purposes so long as the association does not release the original obligor. This statement accords with OCC policy and existing case law. *See, e.g.* National Bank Lending Limit, 54 Fed.Reg. 43398, (1989) (proposed rules); *Corsicana Nat'l Bank v. Johnson,* 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919); *Payne v. Ostrus,* 50 F.2d 1039 (8th Cir.1931). Unfortunately, TB 32–1 does not specifically define "obligor."

The OCC has stated that it "will continue its policy of attributing to general partners loans made to a partnership notwithstanding nonrecourse arrangements in those loans." National Bank Lending Limit, 54 Fed.Reg. 43398, 43403 (1989) (proposed rules) (citing 48 Fed.Reg. 15844 (1983)). Outside the context of bankruptcy, *however, this clarification is not particularly helpful in the case of a non-recourse obligation, such as this Debtor's debt to Southwest, because the "release" concept simply does not fit if the original obligor never had any liability on the debt.* Under 12 C.F.R. § 32.5(c)(i), a loan to a partnership constitutes a loan to each general partner of the partnership; each general partner therefore constitutes "an obligor" of the loan. Consequently, under this interpretation, the substitution of a general partner could constitute the release of an original obligor, rendering the relevant loan subject to the application of the $500,000 LTOB lending limits.

Thus, Southwest asserts that until the OTS directly addresses this issue, Southwest is concerned that the restructuring of the partnership in 1988 and the proposed release and substitution of the general partners under the Plan could constitute a "substitution of obligors" under TB 32–1 and thus, a new loan for LTOB limitations purposes. If so, the proposed treatment for Southwest's Class I Claim violates LTOB limitations, Southwest is precluded from voluntarily participating in the Plan without violating § 5(u) of HOLA and § 301 of FIRREA.

## B. Amortization Schedule.

In addition, the Plan does not incorporate a requirement for mandatory amortization of Southwest's Class 1 Claim. Consequently, by virtue of 12 C.F.R. § 545.35(a) Southwest's restructured loan will be a non-amortizing loan, the term of which may not exceed five years pursuant to applicable FIRREA regulations. The Plan contemplates, however, a term of six years subject to extension for an additional two years at the borrower's option. This exceeds the five-year term requirement mandated by 12 C.F.R. § 545.35(a).

## C. Capitalization of Interest Accruing After Effective Date of Plan.

The Plan also contemplates the deferral and capitalization of interest accruing after the effective date to the extent that net operating income is insufficient to pay currently accrued interest on Southwest's Class I Claim fully. The deferral and capitalization of accrued interest after loan origination is permissible by virtue of 12 C.F.R. § 545.32(b)(4); the aggregate amount of unpaid principal and deferred, capitalized and unpaid interest, however, may not exceed at any time 100% of the appraised value of the collateral property, as determined at the time of the inception of the loan (12 C.F.R. § 545.35(c)). There is no definition for the term "inception of the loan", nor any guidance regarding the definition of a "new loan" or "renewal" for non-LTOB purposes. Therefore, the applicable "cap" is either the appraised value of Buttonwood I at the time the loan was originally made or the value of the property at the time the Plan is confirmed and implemented. Southwest asserts that while it is an oversecured creditor at this time, and while the Debtor's projections contemplate the capitalization of accrued interest only to the extent of $47,066.00, the Plan does not restrict the total amount of capitalization that might occur over the term of the loan and it is theoretically possible that the foregoing loan-to-value ratio restrictions may be exceeded during the proposed loan term.