**In re Stephan M. NELSON.**

**Bankruptcy No. 9009064SEG.**

United States Bankruptcy Court,
S.D. Mississippi, S.D.

Nov. 13, 1991.

treated the judgment as final, such a request is          advisable.

Jack W. Cooke, Jr., Jackson, Miss., for Stephan M. Nelson.

Nicholas V. Wiser, Biloxi, Miss., for AmSouth Mortg. Co.

## OPINION

EDWARD R. GAINES, Bankruptcy Judge.

AmSouth Mortgage Company, Inc. has filed an Objection to Confirmation of the debtor's Chapter 11 Plan of Reorganization alleging violation of 11 U.S.C. Section 1129 requirements for confirmation and the parties have agreed to submit the matter to the Court for determination. Having reviewed the pleadings, the memoranda submitted by the parties, and legal authorities, the Court concludes that the Objection should be and hereby is sustained.

## I. FACTS

1. Stephan M. Nelson filed a petition for relief under Chapter 11 of Title 11 of the United States Code on September 21, 1990.

2. AmSouth Mortgage Company, Inc. holds a first lien on the debtor's real property located at #22 Timberlane, Gulfport, Mississippi. The rate of interest rate provided by the mortgage is 15.5% per annum.

3. The real property is the principal residence of the debtor's ex-wife and his two children.

4. The rate of interest at which AmSouth is currently making mortgage loans is approximately 9.5%.[1]

5. Hancock Bank holds a second lien on the subject property. The rate of interest provided by Hancock's mortgage is 11% per annum.[2]

6. The rate of interest at which Hancock is currently making second mortgage loans is approximately 10%.[3]

7. The debtor filed his Chapter 11 Plan of Reorganization on February 19, 1991.

8. The plan proposes to pay Class Five, which consists of the claim of AmSouth, its claim as of the date of confirmation in the amount of $60,271.30, over a term of fifteen years with interest at the rate presently being charged by AmSouth for a fifteen year mortgage in the amount of approximately 9.6%.

9. The debtor's plan proposes to pay Class Six, which consists of the claim of Hancock Bank, in the approximate amount of $14,605.60, by assuming the obligation according to the original terms and conditions of the note and deed of trust, including the 11% interest rate set forth above.

10. The plan states that Class Five is impaired and that Class Six is unimpaired.

---

1. The debtor's brief, filed September 18, 1991, stated that AmSouth had stipulated that it was making loans secured by single family residences at an interest rate of 9.5%. The court recognizes that this rate may have changed since that date due to fluctuation in the market.

2. This information was provided in supplemental correspondence requested by the court and filed by the debtor's counsel on November 1, 1991.

3. This information was also provided in the requested supplement provided by debtor's counsel. The rate is tied into a statutory maximum under Miss.Code Ann. § 75–17–1 of 10% per annum or 5% above the 90 day discount rate.

11. AmSouth Mortgage Company, Inc. filed an objection to confirmation of the debtor's plan alleging that the plan violates the absolute priority rule of section 1129 by providing the holder of a junior lien claim its full claim in accordance with its original note and deed of trust, while failing to pay the senior lienholder in full.

12. The objection filed by AmSouth also stated that the value of AmSouth's security was fixed at a previous hearing before this Court at $68,000.00.[4]

13. Briefs were subsequently filed by the debtor and by AmSouth on the objection to confirmation and the matter was submitted to the Court for resolution of the issues.

## II. LAW

AmSouth asserts that the debtor cannot reduce the interest rate on its claim from contract to market rate where a junior lien holder is receiving the contract rate of interest on its claim. The debtor counters that the plan may provide for deferred cash payments discounted to present value at the current market rate. In examining these positions the Court must resolve two issues: (1) whether the debtor may, in his plan of reorganization, reduce the rate of interest provided by contract to AmSouth on its oversecured claim; and (2) whether the treatment of AmSouth under the plan is otherwise fair and equitable and does not discriminate unfairly.

█ Analysis of these issues begins with section 1129 which provides, in pertinent part, as follows:

(b)(1) Notwithstanding ... if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly,

and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. § 1129(b). Present value, as required under this section, has been addressed by *Collier on Bankruptcy* as follows:

The concept of "present value" is of paramount importance to an understanding of section 1129(b). Simply stated, "present value" is a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence ...

The concept of "present value" does not define, and thus the court must determine based on the facts of a given case, the appropriate "market rate" which will serve as the measuring standard by which the court can determine whether deferred payments under the terms of the plan have a value as of the effective date of the plan equal to the allowed claim ...

AmSouth is oversecured and the parties have not disputed that the claim of AmSouth is oversecured or the valuation figure. It is also noted that Section 506 states that the value of a secured claim is to be determined in light of the purpose of the valuation.

---

**4.** The court notes that the order entered in the file from the previous hearing held on AmSouth's Motion for Relief from the Automatic Stay does not specifically set forth value determinations made by the Court. However, the reference here is to show that the claim of

It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the "market" interest rate.

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate of a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

5 *Collier on Bankruptcy* ¶ 1129.03[4] (15th ed. 1991). *See also, In re Whatley*, 134 B.R. 561 (Bankr.S.D.Miss.1991); *In re Ferrill*, No. 8708634 SEG, 1988 WL 247983 (Bankr.S.D.Miss.1988) (present value of deferred payments under Chapter 13 cases determined to be the lower of the market rate of interest or the contract rate).[5]

■ In another section, the Code specifically allows that a plan may modify the interest rate that is provided to a creditor under the agreement under which the claim arose. Section 1123(a)(5)(H) provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(5) provide adequate means for the plan's implementation, such as—

(E) satisfaction or modification of any lien;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

11 U.S.C. § 1123(a).[6] On the basis of these sections the debtor is permitted to modify the contract rate of interest provided to the secured creditor to reflect the lower present value interest.

■ A further step in the analysis is necessary where, as here, the secured creditor whose claim has been modified under the plan is oversecured. Section 506 provides that:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a).[7] To the extent that the value of the collateral exceeds a secured creditor's allowed claim, the creditor is an oversecured creditor and may gain the benefits provided under subsection (b) of section 506 which provides the following:

(b) To the extent that an allowed secured claim is secured by property the value of which, after recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). Thus, this section expressly provides that an oversecured creditor is entitled to interest on its claim. A majority of courts considering the issue have determined that this interest to an oversecured creditor should be computed at the rate provided in the agreement.[8] *See,*

---

5. Courts have applied different criteria in determining the appropriate discount factor, as noted in *In re Snider Farms, Inc.*, 83 B.R. 977, 989 (Bankr.N.D.Ind.1988) and *In re Ferrill*, No. 8708634 SEG (Bankr.S.D.Miss.1988), however, this court's approach is the lower of the prevailing market rate or contract rate.

6. This section is also recognized in *In re Dilts*, 100 B.R. 759 (Bankr.W.D.Pa.1989), cited in the brief submitted on behalf of AmSouth.

7. As previously stated, AmSouth's claim has been treated as oversecured based on evaluation of the collateral where the value of the property exceeded the amount of the allowed claim.

8. See discussion in 3 *Collier on Bankruptcy* ¶ 506.05 (15th ed. 1991) on effect of the Supreme Court's decision in *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) where it was decided that postpetition interest was allowable under sec-

*Bkr–L Ed, Code Commentary and Analysis* § 21:253 (1983); 3 *Collier on Bankruptcy*, ¶ 506.05 (15th ed. 1991).

Although different rates of interest may be applied under Section 1129(b), where a market rate of interest may be utilized, and under Section 506(b), where a contract rate may be used, these sections, nevertheless, are not inconsistent within the framework of the Bankruptcy Code. Section 1129 deals strictly with confirmation of the debtor's plan. Thus, treatment of claims in accordance with this section is effective at confirmation, or upon the effective date of the plan. Therefore, the market rate of interest, pursuant to section 1129, would become applicable as of the effective date of the plan. Conversely, interest to an oversecured creditor under section 506(b), at the contract rate of interest, is directed toward interest accruing postpetition, but prior to confirmation, and would therefore only be applicable up to the effective date of the plan. *Collier* also recognizes, in discussion of section 506, that "postpetition interest may accrue until payment of the secured claim or the effective date of the plan". 3 *Collier on Bankruptcy*, ¶ 506.05, 506–44, (15th ed. 1991). *See also, In re Lenz*, 74 B.R. 413, 416 (Bankr.C.D.Ill.1987); *In re Maimone*, 41 B.R. 974, 978 (Bankr. D.N.J.1984); *In re Hildreth*, 43 B.R. 721, 722 (Bankr.D.Idaho 1984).

The position is also supported in the case of *In re Snider Farms, Inc.*, 83 B.R. 977 (Bankr.N.D.Ind.1988). In that case the court made the following rationalizations:

At this point the Court would like to point out the distinction between the continued accumulation of postpetition interest at the contract rate as to an oversecured creditor pursuant to § 506(b) and the determination of the discount rate under "cramdown" pursuant to § 1129(b)(2)(A)(i)(II), § 1225(a)(5)(B)(ii), and § 1325(a)(5)(B)(ii) on confirmation of a plan.

Normally, the accumulation of interest upon a claim against the Debtor stops when the bankruptcy petition is filed. (citations omitted)

11 U.S.C. § 506(b) is an exception to that general rule, i.e. when a secured creditor is oversecured, interest will continue to accumulate post-petition to the extent there is collateral available to pay the interest. Once the collateral is depleted, the creditor no longer has any property interest and therefore the payment of interest abates. (citation omitted) . . .

It should be noted that § 506(b) treats "interest" and "fees, costs or charges" differently. The interest provision is *not* subject to the reasonableness limitation. Where an oversecured creditor seeks interest on its claim, the bankruptcy court applies the security agreement's rate of interest. (citations omitted).

The great majority of the courts have held that the proper rate of interest under § 506(b) is the rate provided by the contract if there is such a contract; that is, the rate to which the creditor was entitled immediately prior to the petition and to which it would have been entitled to in the absence of the petition. (citations omitted).

This rule is only applicable as to the rate of interest to accrue on a pre-petition debt between the date of the petition and the effective date of the confirmed plan. For instance, the discount factor to be used for "cramdown" purposes after the effective date of the plan is governed by § 1129(b)(2)(A)(i)(II) as to Chapter 11, § 1225(a)(5)(B)(ii) as to Chapter 12 and § 1325(a)(5)(B)(ii) as to Chapter 13 and their application should not be confused with the application of § 506(b) prior to confirmation. (citations omitted).

Thus, while the contract rate of interest between the parties is controlling under § 506(b), it is not controlling upon

tion 506(b) even if there is no agreement providing for such interest. That decision discussed the placement of a comma in the statutory language of section 506(b) that had been the cause for a split in authority on issues relating to

interest. Although *Collier* notes that the majority of courts utilized the contract rate under section 506(b) prior to the *Ron Pair* decision, it is also indicated that that rate would still be the appropriate one to apply.

"cramdown" for the purposes of confirming a plan.

83 B.R. at 988–99.

■ The Court concludes that the appropriate rate of interest to be applied to AmSouth's claim should be the contract rate of interest up to the effective date of the plan,[9] and the market rate of interest from and after the effective date of the plan. The debtor's plan provides that the claim of AmSouth would bear interest at the rate presently being charged by AmSouth, thus the plan proposes a market rate. The Court concludes that the debtor's proposed treatment of AmSouth's claim, as it relates to the rate of interest from the effective date of the plan, is a permissible treatment that technically qualifies as fair and equitable for purposes of section 1129(b)(2)(A)(i)(II).

Also to be considered, however, are the allegations relating to the disparate treatment proposed in the debtor's plan to the subordinate lien creditor, Hancock Bank. As previously indicated, the plan proposes to reduce the rate of interest on AmSouth's claim from the contract rate of 15.5% to a market rate which at the present time is approximately 9.5%, while proposing to pay Hancock under the terms and conditions of its agreement which carries interest at the rate of 11%. AmSouth has objected to the debtor's proposal which impairs AmSouth's claim but does not impair the claim of a junior lienholder, and also provides a higher rate of interest to the junior lienholder.

Again referring to section 1129(b), confirmation of the debtor's plan, in the absence of acceptance by an impaired class, may only be accomplished where the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired and has not accepted the plan. Technical compliance with section 1129(b) may not be enough to satisfy the requirement that a plan be fair and equitable. As noted in *In re Sandy Ridge Development Corporation*, 881 F.2d 1346 (5th Cir.1989), the Fifth Circuit stated:

> [T]he bankruptcy court "must consider the entire plan in the context of the particular facts and circumstances [of the case]." *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989). To begin with, simple technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable. *Id.* Instead, this section merely sets minimal standards that a plan must meet, and does not require that "every plan not prohibited be approved." *Id.* Second, even if a plan is "fair and equitable," it must continue to meet all of the requirements of section 1129(a) (with the exception of paragraph (a)(8)).

881 F.2d at 1352. Additionally *Collier* explains that:

> Section 1129(b)(2) does not state that a plan which satisfied the standards contained in that paragraph *is* "fair and equitable." Section 1129(b)(2) merely states that the concept of "fair and equitable" applied to dissenting classes of secured and unsecured creditors or equity interests includes the treatment contained in section 1129(b)(2) ... Thus, stated conversely, a plan which satisfies the standards set forth in section 1129(b)(2) may or may not be "fair and equitable". A plan which does not satisfy the standards set forth in section 1129(b)(2) with respect to a dissenting class or classes cannot be "fair and equitable."

5 *Collier on Bankruptcy*, ¶ 1129.03[4][a] (15th ed. 1991).[10]

> Sections 1129(b)(2)(B) and 1129(b)(2)(C)(ii) contain modification of the Chapter X "fair and equitable rule". Simply stated if a class of impaired unsecured claims or equity interests does not accept the plan, the plan must satisfy the absolute priority rule as to the dissident class and all junior classes. It is important to note that the application of the so-called "absolute priority rule" applies only

---

**9.** This interest would be applicable only to the extent of the value of the security in accordance with the language of Section 506 and as explained in *In re Snider*, 83 B.R. 977, 988 (Bankr. N.D.Ind.1988).

**10.** *Collier* also contains a discussion on the relationship between section 1129(b) and the absolute priority rule at ¶ 1129.03[4][e]. *Collier* states that:

Regarding the requirement that a plan must not discriminate unfairly, *Collier* asserts the following:

> Reducing "discrimination" to its bare essentials, a dissident class must not only receive "fair and equitable" treatment but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.

5 *Collier on Bankruptcy*, ¶ 1129.03[3][b]. With these precepts in mind, the focus is now on determining whether a proposal to pay an impaired secured creditor the full value of its claim plus the market rate of interest, while at the same time proposing to pay an unimpaired junior lienholder on the same collateral a rate of interest consistent with the contract rate, which is higher than the market rate of interest, is a fair and equitable proposal that does not unfairly discriminate, notwithstanding technical compliance with section 1129(b)(2)(A)(i).

First, it is noted that section 1129(b) does not proscribe discriminatory treatment between claims. Rather, the prohibition is on unfair discrimination. In the case of *In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr.S.D.N.Y.1990), a creditor objected on the basis of section 1129(b) to the plan's proposal to pay a slightly lower rate of interest on its Class I Claim for a first mortgage than the rate of interest proposed to be paid to the Class II claimant for its second mortgage. The court made the following conclusions:

> in cases when a class of unsecured claims or equity interests is impaired and does not accept the plan. In that event, the absolute priority rule does not apply to all classes of unsecured claims and equity interests, but only to the dissenting class and classes junior to the dissenting class.

*Id.* Since the dissenting class here, AmSouth, is not a class of unsecured claims or equity interests that is impaired, but is a senior secured class that is receiving the full amount of its allowed claim, the Court will not specifically address the AmSouth objection in relation to the absolute priority rule, although the pleadings by AmSouth do allege a violation of the rule. The Court does view, however, the overall context of

Some courts hold that for discriminatory treatment of claims to be fair, four tests must be satisfied: (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale. (citations omitted) . . .

First, there is a reasonable basis for discrimination. Unlike unsecured claims, every secured claim is different. Secured claims usually are secured by different collateral and usually have different priorities even if secured by the same collateral. This fact leads to the permissibility of individualized treatment based on the particularities of each secured claim . . .

Fourth, the degree of discrimination is in direct proportion to its rationale. Here, the slight degree of "discrimination" is justified. The difference in interest rates can be attributed to a slightly higher degree of risk that the Class II claimant bears because of its second priority status.

The only case cited by Southwest in support of its objections based on § 1129(b) is *In re Dilts*, 100 B.R. 759 (Bankr.W.D.Pa.1989). Although the case may seem similar to the present situation, it is distinguishable and not applicable here. The *Dilts* Court stated:

> [T]he debtors' plan would leave unimpaired a junior secured claim on their

the plan in determining whether it is fair and equitable and whether it unfairly discriminates and notes that the issues bear resemblance to problems that have been litigated in relation to the absolute priority rule. The situation here is somewhat the reverse of a more typical scenario where a junior class would complain that a senior class is overcompensated. Here, the senior class is to receive the full value of its claim, but a junior class may be receiving more than the value of its claim. The Court does recognize, however, that AmSouth argued that it was not receiving the full value of its claim and should have been provided the contract rate of interest.

residence while it would impair the first mortgage lien.

\* \* \* \* \* \*

We find no support in the Code for the proposition that debtors may impair an oversecured creditor, over its objections, by reducing the interest rate and extending the term of the repayment period while a junior mortgageholder on the same property is to receive payment in full over an extended period at a higher interest rate than that proposed to the first mortgageholder.

*Id.* at 760–61. In the present Plan, both Class I and Class II are impaired. Moreover, from the credible testimony adduced at the confirmation hearing, this Court finds that the proposed rate to be paid on Southwest's Class I Claim is a fair and reasonable reflection of the market rate.

In accordance with the foregoing discussion, this Court finds that the Debtor's Second Amended Plan of Reorganization is Confirmable under Code § 1129(a) and (b) notwithstanding the filed Objection.

111 B.R. at 63–64. The Court also acknowledges the case of *In re Orosco,* 77 B.R. 246 (Bankr.N.D.Ca.1987), cited in the debtor's brief, in which the debtor's plan was confirmed where junior lienholders were allowed an additional one-half percent interest beyond that provided senior lienholders. *See also, In re Tavern Motor Inn, Inc.,* 56 B.R. 449, 454 (Bankr.D.Vt. 1985) (treatment of claims was not discriminatory, inequitable or unfair where the treatment reflected common business practices).

At this point the Court also notes that the *Dilts* case referred to in the above citation from *Buttonwood,* is also cited for support in the brief submitted by AmSouth. In that case, the court denied confirmation finding that the debtor's plan was not fair and equitable and did discriminate unfairly where an oversecured creditor's claim was impaired and the claim of a junior lienhold-

er whose claim was unimpaired was provided a higher rate of interest. Although factually analogous to the present case, this Court cannot view that decision with precedential value as it was subsequently reversed upon reconsideration in *In re Dilts,* 126 B.R. 470 (Bankr.W.D.Pa.1991). The new *Dilts* decision stated the following:

> Upon reconsideration of the record and the Debtors' subsequent Second Amendment to the Plan, we will reverse our prior decision ...

Thus, the issue as stated in our prior Opinion, "whether the Debtors, under 11 U.S.C. §§ 1123 and 1129(b) can modify a first mortgage lien on the Debtors' residence in a Chapter 11 Plan when a junior second mortgage on the same property is treated as a separate class and remains unimpaired under the Plan" is moot ...

We also find no merit in Mellon's objections that the Plan is unfairly discriminatory and is not fair and equitable and therefore violates § 1129(b)(1). The Second Amendment to the Plan eliminates the proposition in the original Plan that Debtors may impair an oversecured creditor, over its objections, by reducing the interest rate and extending the term of the repayment period while a junior mortgage holder on the same property is to receive payment in full over an extended period at a higher interest rate than that proposed to the first mortgageholder. The Second Amendment provides the same rate of interest and extends the term of both loans ...

The Bankruptcy Code contemplates deferred payments of secured loans generally and does not exempt a secured creditor from impairment of its loan because it is oversecured ...

We hold that the Debtor's Plan, as amended, is fair and equitable and does not unfairly discriminate. The Debtors' Plan, as amended, will be confirmed.

126 B.R. at 471–73.[11]

■ Upon this background, the Court concludes that the debtor's plan may dis-

---

**11.** Although in this *Dilts* case, the rate of interest proposed to the senior and junior lienholder

was modified to be the same rate, thus eliminating an argument addressed in the prior *Dilts*

criminate in proposing to pay a junior mortgageholder a higher rate of interest than that provided to the senior mortgageholder of the security, provided that the proposal meets the requirements of present value under section 1129(b)(2)(A)(i)(II). Thus, as long as the rates of interest provided are what is borne in the current market for each creditor, treatment of this nature should not render a plan to be unfair, inequitable, or unfairly discriminatory. Based on the current rates of interest provided by counsel in this case, the market is not at this time bearing the same rate of interest for a second mortgage as on a mortgage of first priority. Therefore, the proposal, objected to by AmSouth, to pay Hancock Bank a higher rate of interest is not in and of itself a sufficient justification upon which to conclude that the plan is inequitable or unfairly discriminatory. Neither should impairment of a senior class by modification of the contract rate of interest, in and of itself, provide a sufficient basis to find unfair discrimination. Rather, the test for the appropriate rate of interest that should be proposed to a particular class or creditor is based on the present value as of the effective date of the plan that the current market is bearing for that particular type of claim.[12] Therefore, as long as each creditor receives that value, the plan proposal may be permissible notwithstanding dissimilar rates of interest.

■ The plan, as currently proposed, provides for the market rate of interest to the senior lienholder by impairment of its claim, while also providing a higher than market rate of interest to the junior lienholder.[13] This Court concludes that the treatment provided under the plan to AmSouth, is unfairly discriminatory and is not fair and equitable. For these reasons the Court must find that the debtor's plan, in its current state, is not confirmable. The Court further notes that any modification that may be necessary for the plan to conform to the above discussed standards must be proposed by the proponent of the plan in accordance with Section 1127, and on proper notice to the parties, as it would not be appropriate for the Court to propose such modification in this opinion.

An additional argument advanced by AmSouth is that the rationale of *In re Franklin*, 126 B.R. 702 (Bankr.N.D.Miss. 1991) should be extended to Chapter 11 cases such as this one. In *Franklin*, Judge David Houston held that section 1322(b)(2), which prohibits modification of rights of holders of secured claims that are secured only by the debtor's principal residence, is applicable only to the extent that the claim is secured, and that the unsecured portion of the claim could be modified. Extension of this rationale here would prohibit modification of the interest rate as provided by the agreement between the parties. However, section 103(h) of the Bankruptcy Code provides that "Chapter 13 of this title applies only in a case under such chapter." Therefore, section 1322(b)(2) is applicable only in a Chapter 13 case and not in a Chapter 11 case. Since there is no comparable section in Chapter 11, the Court finds no statutory authority for extension of this principle to Chapter 11 proceedings, and none having been cited by the creditor, the Court declines the invitation to make that extension. Moreover, even if such a provision were to be made available to Chapter 11, it would be inapplicable here since the residence that is the subject property of this dispute is not the principal residence of the debtor, as required under section 1322(b)(2). It is the residence of the debtor's former spouse and his children.

---

decision, this Court submits that it is not necessarily required that these claimants be given the same rate of interest, as discussed herein.

**12.** This is the case where the current market rate is less than the contract rate of interest. As this court has previously ruled in *Ferrill* and *Whatley* discussed above, if the contract rate were the lower rate, this court would consider application of that rate.

**13.** The contract rate proposed to be paid to Hancock Bank in the plan may have been the market rate at the time the plan was filed. However, present value under section 1129(b) is to be provided as of the effective date of the plan, or confirmation. The Court takes notice that mortgage interest rates in the market have fallen since the time the plan was filed.

On the basis of this opinion, the Court concludes that the objection of AmSouth to the debtor's plan of reorganization should be and hereby is sustained.

A judgment shall be entered consistent with these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 58 and Bankruptcy Rule 9021.